115 So.2d 505

CITY OF BIRMINGHAM

v.

Mrs. George A. SCOGIN et al.

6 Div. 449.

Supreme Court of Alabama.

Nov. 5, 1959.

J. M. Breckenridge, Birmingham, for appellant.

James & Beavers, Birmingham, for appellees.

STAKELY, Justice.

This is an appeal by the City of Birmingham, a municipal corporation, from a decree granting a temporary injunction based on the bill of complaint as last amended filed against the City of Birmingham by the complainants Mrs. George A.

Scogin, Mrs. J. B. Parker and Mrs. Forrest R. Blair. § 1057, Title 7, Code of 1940. The hearing for a temporary injunction was before the court on May 27, 1959.

The bill of complaint alleges that the respondent, the City of Birmingham, a municipal corporation, was operating a garbage dump on land more particularly described in a map which is marked Exhibit A and made a part of the bill of complaint, which land is separated from the complainants' land by a railroad right of way, that said city through neglect or carelessness and unskillfulness of its officers, agents, servants or employees, has permitted the garbage dump to become a health hazard to complainants and to become a breeding place for germs, rodents and vermin and that the city through its agents, officers, servants or employees has operated the garbage dump and has suffered the area in the immediate vicinity of the complainants' property through neglect, carelessness and unskillfulness to become offensive, obnoxious and detrimental to the health of complainants and other residents of the area and that the existence of such condition has continued for such a length of time as to raise the presumption of knowledge on the part of the City Commission of Birmingham, that demands have been made upon the city to abate this condition and that the city has refused, that the premises being used as a garbage dump are in a residential district of the city, that complainants have an investment of thousands of dollars in their homes and that the continued operation of the garbage dump in the above described manner will diminish, if not entirely destroy, the rental and sale values of the complainants' property, that inconvenience and damage to the complainants by reason of the negligent, careless and unskillful operation of the garbage dump are permanent, continuous and constantly recurring so that complainants have no full, adequate remedy at law, that the garbage dump at its present location is not a fit or suitable place for a garbage dump and is a nuisance, that unless the city is restrained from the opera-

tion of the garbage dump complainants will be compelled to smell noxious odors, vapors and gases that arise from the dumping of the garbage, that the lands on which the properties of the complainants are located and the garbage disposal operation is now being carried on is in an A residential property zone as now classified by the existing zoning laws of the City of Birmingham and the operation of a landfill garbage disposal dump as now carried on by the respondent, is prohibited by the terms of the aforesaid zoning ordinance and is unlawful.

In the prayer of the bill the complainants seek a temporary injunction immediately enjoining the City of Birmingham from the further use and operation of the garbage dump in the area in the immediate vicinity of the property of the complainants. Upon a final hearing of the cause the complainants pray that a permanent injunction be issued against the respondent prohibiting it from further operating the garbage dump in the area as hereinabove described.

The map attached to the bill of complaint and marked Exhibit A shows that the homes of the three complainants are built on lots which abut in the rear on a railroad right of way. Going to the evidence for the moment, it shows that the City of Birmingham purchased the land across the railroad right of way on April 2, 1952. This deed was recorded in the office of the Judge of Probate of Jefferson County, Alabama, on April 3, 1952. The deed recites a consideration of $9,000 and includes the land conveyed thereby described in Exhibit A to the bill of complaint upon which the garbage disposal area involved in this suit is located. The complainants purchased their property at dates later than the date when the City of Birmingham purchased its property. The map shows that the land purchased by the City of Birmingham lies along the railroad right of way and is bisected by a creek which runs from north to south through the land. The land across the creek has been used

in the past by the city for the disposal of garbage. A portion of the land lying between the creek and the properties of the complainants had been used for garbage disposal for about two months prior to the institution of this suit.

We set out in substance the testimony of each of the three complainants as follows.

Mrs. George A. Scogin, one of the complainants, testified that the City of Birmingham was operating a garbage dump on land described in Exhibit A to the bill of complaint and this is separated from the property of the complainants by a railroad right of way, that the city began dumping in the area immediately across the railroad right of way about two months prior to the date of the hearing. She testified that she had observed noxious odors almost every day and that when the odors appear she, goes inside and turns on the air conditioner. This complainant further testified that she purchased her house in 1953, paying $7,700 for the property, that the property is. now worth about $8,000. She further testified that prior to two months before the hearing the city had operated a garbage dump across the creek from where they are now dumping and accordingly in the past two months have come closer to her property. She estimated the right of way of the railroad between her property and the garbage dump area was about 25 feet wide and not 100 feet wide. She did not smell odors prior to two months ago and the odors were more intense early in the morning and late in the afternoon. The city had used the area across the creek from where they are now dumping for a period of about four years.

Mrs. J. B. Parker, another complainant, testified that she lived on the other side of Mrs. Scogin and that her property backs up to the railroad track. She bought her house six and one-half years ago. The city was dumping in the area across the creek at that time but she did not know it. There were trees and bushes that obscured the view of. the dump. There were no noticeable odors at her house prior to the time dumping began on her side of the creek but odors were very noticeable since then. She goes to work at seven o'clock in the morning and returns home at 6:30 p. m. When she returns home she turns on the air conditioner. She went over to the dump about three weeks prior to the hearing when they were not working over there and found some exposed garbage and some old water standing. The same odor that comes from her garbage can comes from the garbage dump.

Mrs. Forrest Blair, one of the complainants, testified that she had lived in the vicinity of the city dump for five years. She paid $8,100 for her house and its value immediately before the city started dumping was $7,100. She had observed odors since the city started dumping two months ago. She had odors before two months ago from the old dump across the creek. She lives about 100 feet from the dump. Dumping is carried on all day long. She has big cock roaches in her back yard. She lives next door to Mrs. Scogin, another complainant. She had not noticed any odors from the creek.

Other residents of the neighborhood gave testimony substantially similar to the testimony of the complainants.

In addition Roy E. Smith, Jr., a witness for the complainants, testified in substance that he was a real estate broker licensed since 1938 and had "practiced real estate" the last thirteen years and that he specializes in real estate in the western section and that Court Q and Quincy Court are in the western section. The houses in the vicinity of Court Q and Quincy Court range in price from $7,500 to $12,000. In his opinion there has been a lessening in the value of the houses in the vicinity of the dumping operations by reason of the dumping.

Mr. John Steineicher, a witness for the complainants, testified in substance that he was Planning Director of the City of Birmingham and that the official zone map of the City of Birmingham showed that the

area where the complainants' houses are located and where the garbage disposal area is located is zoned A-Residential under the Zoning Ordinance of the City of Birmingham. The pertinent part of the zoning ordinance was introduced in evidence.

Ernest B. Reed, a witness for the complainants, testified in substance that he lived on the road leading to the dump and that he has gone over to the dump four times. On his first visit there was a lot of odor and quite a few flies and there was garbage that was not completely covered. On his second visit there was odor but garbage was uncovered in just a few small spots. He noticed a few flies. Trucks going to the garbage dump start coming by his house at 4 a. m. and between 4 a. m. and 7 a. m. a garbage truck passes his house at the rate of one every fifteen minutes. He noticed two drag lines and a bulldozer on the dump. He used to graze cattle in the area where the city has a temporary road to the garbage area and he had moved his cattle out but was not required to do so by the owner of the land over which the temporary road is constructed. The city has improved the street going by his house with something but he does not think it is paving.

The City of Birmingham, introduced in its behalf the affidavit of Guy M. Tate, Jr., Director of the Bureau of Sanitation of the Jefferson County Department of Health, wherein he says that he inspected the city's garbage disposal area on May 12, 1959, at 3 p. m. and on May 20, 1959 at 9:30 a. m. On the May 12th inspection all of the garbage to be disposed of that day was in place and compacted and the final daily covering was being placed over it. On the inspection on May 20th the operation was in full swing and garbage trucks were coming in at a fairly rapid rate. On both of these occasions the sanitary landfill was being operated in a manner that indicated excellent sanitary engineering practices and all the recommendations made by the Jefferson County Health Department were being carried out in every detail. There

was no indication of rodents, the number of flies was at a minimum and there was no evidence of a nuisance of any kind. In carrying out this operation the City of Birmingham is placing particular emphasis on adequate equipment and is taking extra precautions to spray the operation with insecticide emulsion for the control of flies every few hours during the day.

There was also introduced in behalf of the respondent the affidavit of Paul Pate, Assistant Director of the Bureau of Sanitation of the Jefferson County Department of Health, wherein he says that at the request of the Superintendent of Streets and Sanitation for the City of Birmingham, he made an initial inspection of the garbage disposal area prior to the commencement of operations there for the purpose of making recommendations as to the type of operation to be conducted and the drainage necessary for the operation. He recommended that (1) a channel be cut from the railroad right of way to the creek at each end of the city property so that surface water would flow into the creek, (2) that trenches be cut paralleling the creek and earth removed from trenches be stockpiled adjacent to the trenches to be utilized as cover material for the garbage, (3) that little cells of garbage be compacted into the trenches and that after each day's operation the garbage be covered with earth or other suitable cover material. He further says that he made several inspections of the operations during the day and upon completion of operations for the day. Recent dates of inspection made were May 6th, May 7th, May 12th and May 20, 1959. No prior notice of the dates or times of the inspections was given to city employees at the operation and on his inspections he found conditions good as they relate to sanitation. In his opinion the sanitary landfill operation is being conducted in keeping with good sanitary engineering practices and that a health hazard is not being created by the landfill operation. No rodents or signs of rodents were observed and no flies were observed in large numbers.

There was introduced in evidence as respondent's Exhibit D the original deed conveying to the City of Birmingham the land being used as a garbage disposal area. This deed shows that it is dated April 2, 1952, and was recorded in the office of the Judge of Probate of Jefferson County, Alabama, on April 3, 1952. The deed recites a consideration of $9,000 and includes in the land conveyed thereby the land described as Exhibit A to the bill of complaint upon which the garbage disposal area involved in this suit is located.

Mr. P. H. Walkley, a witness for the respondent, testified in substance that he is an inspector specializing in control of vermin and is employed by the Jefferson County Board of Health and had been so employed for thirteen years. Mr. Guy M. Tate is his immediate superior. As a part of his duties he makes frequent inspections of sanitary landfills and other garbage disposal areas around the county. He makes inspections of the garbage disposal area involved in this suit on a weekly basis since April 22, 1959, and he had made about six such inspections. He last inspected the area on the day preceding the trial of this case and the garbage on the disposal area is packed daily in cells and covered with earth daily. A new operation begins the next day. On his inspections he found the garbage being packed very well and coverage being made. He found the employees using spraying equipment with a chemical called malathion which is doing a good job on fly control. He found very few flies on the disposal area. The city was using two machines in the operation, one machine had loaders on front and the other a bulldozer which followed behind pushing the garbage into position and packing it. He observed men cleaning up refuse that would become scattered from the machine tractor and he detected no odor except the odor of fresh garbage when he got up actually to the burial site. He detected no odor other than as described on any of his inspections. He saw no evidence of roaches. Large black roaches are found generally throughout the City of Birmingham and outside thereof around yards in residential areas and in wooded sites. Drainage is provided for the garbage disposal area and the drainage is not through the garbage. He saw no pollution in any water on the area during the six times he was there. He gave no prior notice on any of the six inspections he made to the City of Birmingham or any employee of of the city.

On his first visit it was cold weather and he saw no spraying equipment and saw no flies either. He found no odor coming from the old disposal area across the creek. He has in the past observed an odor coming from the creek and that in the past years he has had calls out there relative to odors from the creek. That water does not drain through the garbage into the creek. The city was covering the garbage with six inches of dirt. Germs could be carried by flies. He had received no information about snakes at the garbage disposal area. He made periodic inspections of garbage disposal areas in Jefferson County. He has had complaints relative to the odors from the creek at the location in question prior to the time the city began disposing of garbage in the area.

Dr. George A. Denison, a witness for the respondent, testified that he is a County Health Officer and had been County Health Officer since 1942. His qualifications were admitted. He made inspection of the garbage disposal site involved in this suit on May 12th and he found a sanitary landfill which, in his opinion, was being properly operated. His inspection was made at 3 o'clock in the afternoon when it was still in operation. The last truck had just dumped garbage. The garbage was placed in a trench about 50 feet wide. It was compacted and covered over with dirt which constituted a cell. The total operation consisted of one cell after another and the operation is known as the landfill method. He noticed a slight odor at the site of the dump but did not notice any odor any distance from the operation. He saw a few flies but they were not excessive and were

well under control. He saw no evidence of rats or vermin. In his opinion the operation which was being carried on at the time of his inspection did not create a health hazard to the people in the area. If garbage were deposited on the area between 4 a. m. and 7 a. m. in the morning without any covering or spraying or other attention and left for three hours in such condition, it would not create a health hazard in the neighborhood, although it might create some odor that would temporarily be objectionable. It is customary in this type operation to be sure all garbage is completely covered at the end of a day's operation. In a sanitary landfill operation the normal procedure is to use the treads of a bulldozer to pack the garbage down and this is the recommended procedure.

Mr. W. H. Kittrell testified, as a witness for the respondent, substantially as follows. He lived in Montgomery, Alabama, and was employed by the State Department of Health as Director of Vector control in the Bureau of Sanitation. He had been employed by the State Health Department for 22 years. He held a B. S. Degree in Engineering and a Master of Public Health Degree. Among his duties with the State Health Department he acted as advisor and consultant to county health departments and local governments on matters pertaining to the control and prevention of insects and rodents and this included the inspection of garbage disposal areas. He made an inspection of the garbage disposal area involved in this suit on May 20th. On his inspection he found there had been excavated a strip of land roughly 50 feet wide and several hundred feet long parallel with the railroad right of way and lying between the railroad and Valley Creek, which excavation was four or five feet deep and dirt had been piled in windrows on each side of the excavation and a ramp type landfill had been started in the center section of the excavation compacting the refuse on the slope and the earth piled up on the side was being used for covering material and the center section had been surfaced with mine waste, black slate or

slag. Drainage had been provided and was adequate to take care of the drainage in the fill. He did not see any flies on the garbage disposal area. Tractors were being used to compact the garbage and they were adequate for this purpose and were doing an excellent job. He saw no rats or roaches or evidence of rats or roaches on the disposal area. Large black roaches are common in Birmingham. He observed an odor at the working space on the disposal area but he did not detect any odor over beyond a few feet from the working space. The method being used is a method recommended by the State Health Department. The disposal of garbage as being carried on during his inspection would not create a health hazard. Spraying of the area was being made from a spray machine mounted on a pickup truck and that spraying with a malathion emulsion would be effective on flies in this area. The material in the spray has a residual effect and will remain effective for a considerable time. Any flies landing on a sprayed area would probably be killed by the residual effect. It had rained the night before but there was no water standing on the area. He had inspected about twenty-five landfill operations in Alabama. He has seen one landfill dump as close to residences as this one and that was at Gadsden on a city housing project and he had not seen any other landfill operation as close to residences as this operation.

The testimony of A. H. Moncrief, a witness for the respondent, is largely corroborative of the testimony heretofore set out for the respondent except that it will take the city three or four months to complete the present dumping operations on the land involved in this suit and that Exhibit E introduced for the respondent shows the actual dump site itself. Exhibit F is a picture of the sanitary landfill where garbage has already been dumped. Exhibit G is a picture of a drainage ditch on the east end of the fill and a large rock is shown near the ditch, that the ditch drains to the creek. Exhibit H is taken from the present sanitary landfill and shows an area across the

creek which is the old sanitary landfill. Exhibit I is a picture of the present sanitary landfill from the extreme northern end of it. Exhibit I shows where garbage had been dumped and covered up the day the picture was taken. Exhibit J is a picture of the east end of the disposal area looking west. Exhibit K is a picture of the sanitary landfill from the center looking east. Exhibit L is a picture of the sanitary landfill taken from the railroad track. The landfill operations are to the right beyond the dirt shown piled up in the respondent's Exhibit I and the houses are to the left in the picture. Exhibit M is another picture taken from the railroad track and the residences are to the left and the disposal area to the right in relation to the picture. Exhibit N is a picture taken a little further to the north of the railroad right of way and shows the houses to the left and the garbage disposal area to the right. His testimony further shows that there is a slight odor on the disposal area but he could not detect it 20 or 30 feet away.

The testimony of N. R. Daniels, a district supervisor for the City of Birmingham, over garbage disposal and street work in the western section of the city, which is the area involved in this suit, is largely corroborative of the testimony for the respondent which has heretofore been set out.

Mr. Neal McRae, a witness for the respondent, testified in substance that he is Superintendent of Streets and Sanitation for the City of Birmingham, had been with the city for twenty-five years. His testimony is largely corroborative of the testimony of the respondent which has been heretofore set forth, except that he goes to the disposal area involved in this suit two or three times a week and testified that it is operated as a sanitary landfill, that garbage is placed in a channel about fifty feet wide and generally in depth from four to eight feet and is compacted and covered with earth and the garbage for each day is sealed into separate cells, that 34th Street was paved from Brighton Road to the dead end before dumping started in the area involved in this suit, that the road from the dead end and across private property was cleared out with equipment and surfaced with mine rock so that it would not be muddy, that the road is machined as needed and wet down on dry days at least once a day, that the City of Birmingham does not have any garbage disposal area in the western section of the city at the present time except the area involved in this suit, that the only garbage disposal area in the city at the present time other than the area involved in this suit is the airport dump, that the additional cost to the city to dispose of the garbage in the airport dump which is now being deposited in the area involved in this suit would be in excess of $450 per day, that the City of Birmingham is at present in the process of acquiring approximately five acres for the disposal of garbage in the western section and that the matter has been sent to the city's legal department for handling, that the city is not going to dump up to its boundary line and is not going any closer to its boundary line than twenty feet.

I. This court has often said that there can be no abatable nuisance in doing in a proper manner what is authorized by law. Fricke v. City of Guntersville, 251 Ala. 63, 36 So.2d 321; Branyon v. Kirk, 238 Ala. 321, 191 So. 345; Harris v. Town of Tarrant City, 221 Ala. 558, 130 So. 83; Downey v. Jackson, 259 Ala. 189, 65 So.2d 825.

The city of Birmingham is expressly authorized to establish garbage areas by Section 496, Title 37, Code of 1940, as amended. In the Code of 1907 the legislature authorized municipalities in this state to establish and maintain crematories for the destruction of garbage. This is § 1282 of the Code of 1907. This section was brought forward as § 2039 of the Code of 1923. Then it was brought forward as § 496, Title 37, Code of 1940 and in 1947, as shown in the General Acts of 1947, p. 26, the legislature amended the aforesaid section 496 so that the section as amended reads as follows:

"§ 496. Disposal of garbage, etc.— All cities and towns of this state shall

have the power to establish and maintain crematories for the destruction of garbage and like substances, or to otherwise dispose of garbage, either within or without the city limits, and to haul or cause to be hauled to such crematories, or other places of disposal, trash and garbage of all kinds, and cause the destruction of same, in such manner as may be deemed expedient by the proper municipal authorities, and to fix and collect such reasonable fee as may be necessary to carry out the provisions of this section."

See § 496, Title 37, p. 316, 1955 Cumulative Pocket Part, Code of 1940.

■ The foregoing section as amended gives to municipalities of this state the power and authority to collect and dispose of garbage originating in such municipalities in such manner as may be deemed expedient by the municipal authorities. The action of a government agency acting within its authority will not be controlled or revised by injunction. Brammer v. Housing Authority of Birmingham Dist., 239 Ala. 280, 195 So. 256; Goodwin v. State Board of Administration, 212 Ala. 453, 102 So. 718; Lehmann v. State Board of Public Accountancy, 208 Ala. 185, 94 So. 94.

In the case of Downey v. Jackson, 259 Ala. 189, 65 So.2d 825, this court held that the construction and operation of a public project by a city exactly as authorized by law and strictly in accordance with good practice cannot be a nuisance although it may work damage to others. To like effect was the holding in McClung v. Louisville & Nashville R. Co., 255 Ala. 302, 51 So.2d 371. We think it can be stated as true that the disposal area of garbage involved in this suit is not a garbage dump as such expression is usually used. On the contrary, it is a sanitary landfill garbage disposal operation. The undisputed evidence shows that the disposal area in this case is not a health hazard. We further think that there is no evidence to show that the disposal area increases the number of rodents,

roaches or snakes. Nor does it increase flies to any appreciable extent. We can well understand that it is not unreasonable for persons living near a sanitary landfill garbage disposal operation to object to such operation. It is just human nature to object to such an operation even though it is operated strictly according to the best practices and is not a health hazard and does not emit obnoxious odors. However there are many annoyances and inconveniences which are the usual and ordinary result of urban life. Sometimes these annoyances are small and sometimes great. There is always a question of degree, considering the type and kind of activity which is alleged to be an abatable nuisance. The activity which was enjoined in this case is an activity not only beneficial to the people of a large city, but seems to us to be necessary to protect the health of the inhabitants thereof, including the appellees whose garbage is picked up by the city.

It is an activity specially authorized by legislative act as we have shown. According to the evidence the city has only two garbage disposal areas, one in the western section and one in the eastern section of the city. The distance between the two is over ten miles through city traffic. We can understand the hazard to the health of inhabitants of a large city such as the City of Birmingham which would result should the temporary injunction be allowed to stand, prohibiting the use of the garbage disposal area in the western section of the city.

The evidence in this case shows that a large number of truck loads of garbage per day was being deposited in the disposal area here involved prior to the injunction issued in this case. This amounts to ⅓rd of the total daily garbage collected by the City of Birmingham. It costs the city an additional sum of $450 per day to transport garbage from the western section to the eastern section garbage disposal. The three complainants in this case bought their present homes after the time the city purchased the land in 1952.

■ We quite understand that although the operation of a landfill garbage disposal operation is a governmental function yet if the operation is conducted in a negligent manner by the agents, employees or servants of the City of Birmingham and as a result thereof a nuisance is created, the nuisance is subject to being abated by an injunction. In fact we so held in Downey v. Jackson, 259 Ala. 189, 65 So.2d 825, and in City of Bessemer v. Chambers, 242 Ala. 666, 8 So.2d 163. The case of Downey v. Jackson, supra, is cited in briefs by both sides to this controversy. The case of Downey v. Jackson, supra, is a case which we think should be followed in the present controversy. In Downey v. Jackson, supra, this court said [259 Ala. 189, 65 So.2d 828]:

"* * * in respect to a nuisance, negligence is necessary to charge the city with liability for creating it when a legislative enactment authorizes it. City of Bessemer v. Chambers, 242 Ala. 666, 8 So.2d 163.

"It follows, we think, that if in the performance of a legally authorized enterprise the city neglects to do that which it should have done in an exercise of due care, thereby creating a nuisance to the damage or unnecessary annoyance of residents, the appropriate judicial course in equity is to enjoin doing the negligent act which is the guilty agent or modify its use so as to relieve it of the injurious consequences, or minimize them to where no just complaint could be made. We think that theory should be the guiding principle here applicable. * * *

* * * * * *

"* * * while this is a lawful enterprise it should not be conducted so as to constitute an unnecessary or unreasonable nuisance. That means to uphold the well established principle that the construction and operation of a governmental agency by authority of law, constructed and operated exactly as authorized by law, and strictly in accordance with good practice, cannot be a nuisance in law, though it may work damage to others."

In Downey v. Jackson, supra, the lower court did exactly what the lower court has done in this case. The lower court enjoined outright the playing of night baseball on the ball diamond involved. In this case the lower court enjoined outright the disposal of garbage in the disposal area here involved. In Downey v. Jackson, supra, this court modified the injunction so as not to stop the playing of night games, but enjoined the respondents from causing the glare of lights used for night games to the extent that this can be reasonably done by a screen suitable to that end.

■ It does not seem to us that in the present case the court applied the principles laid down in Downey v. Jackson, supra. In this case if there was no negligence on the part of the City of Birmingham in the operation of the disposal area, the injunction should have been denied. On the other hand if the court found any negligence on the part of the City of Birmingham, then only the negligent act or acts should have been enjoined. It seems to us that under the evidence the only act of the City of Birmingham which should be enjoined is the unreasonable creation, if any, of noxious odors or fumes by the landfill garbage disposal operation, if such obnoxious odors continued for an unreasonable length of time. We think it is clear that the landfill method of disposing of garbage is a modern and sanitary method when employed and operated as the evidence shows in this case.

We consider that the decree of the lower court should be modified so as to enjoin the depositing of any garbage in the area involved which is not covered over by six p. m. of the day on which the garbage is deposited, since the operation will be completed in the next three or four months and the days will for the most part be shorter. If necessary, the channels or

690

trenches should be made shorter in length and narrower in width so that this result can be better accomplished.

**II.** This brings us to the issue of zoning which has been raised in this case. The Alabama cases have long held that zoning does not apply to the operation of a governmental function by a municipality. Lauderdale County Board of Education v. Alexander, Ala., 110 So.2d 911; Alabama Alcoholic Beverage Control Board v. City of Birmingham, 253 Ala. 402, 44 So.2d 593.; Water Works Board of City of Birmingham v. Stephens, 262 Ala. 203, 78 So.2d 267. See also 58 Am.Jr. p. 1009, § 120; 101 C.J.S. Zoning § 135, p. 893.

**In this state it has been consistently** held that a municipality in operating a garbage disposal area is discharging a governmental function and not a proprietary function. City of Tuscaloosa v. Fitts, 209 Ala. 635, 96 So. 771; Kirk v. McTyeire, 209 Ala. 125, 95 So. 361; City of Bessemer v. Abbott, 212 Ala. 472, 103 So. 446; City of Bessemer v. Chambers, 242 Ala. 666, 8 So.2d 163; Brown v. City of Fairhope, 265 Ala. 596, 93 So.2d 419.

The appellees cite in their behalf the case of Jefferson County v. City of Birmingham, 256 Ala. 436, 55 So.2d 196. We have examined the original record in that case and find that the case did not involve a garbage disposal area. It was a bill for a declaratory judgment to determine whether a sewage disposal plant which Jefferson County proposed to construct and operate under a legislative act which provided for the issuance of revenue bonds and the charging of a sewer service charge to all property using the sewers installed under this act was violative of the zoning ordinance of the City of Birmingham. It was held that Jefferson County would be operating a facility similar to water works, gas works, etc., and under the decisions of this court such facility would be a proprietary function of a municipality and properly subject to the zoning ordinance. In Water Works Board of City of Birmingham v.

Stephens, 262 Ala. 203, 78 So.2d 267, this court held that the operation of a water tank was subject to zoning since the operation of a water tank was a proprietary function and subject to zoning. So Jefferson County v. City of Birmingham, 256 Ala. 439, 55 So.2d 196, is consistent with the holding of this court that maintenance of sanitary sewers by a municipality is a corporate and proprietary function. As pointed out this court has held that garbage disposal is a governmental as distinguished from a corporate or proprietary function. City of Tuscaloosa v. Fitts, 209 Ala. 635, 96 So. 771; Kirk v. McTyeire, 209 Ala. 125, 95 So. 361; City of Bessemer v. Abbott, 212 Ala. 472, 103 So. 446; City of Bessemer v. Chambers, 242 Ala. 666, 8 So.2d 163; Ivory v. City of Montgomery, 35 Ala.App. 631, 51 So.2d 559; Brown v. City of Fairhope, 265 Ala. 596, 93 So.2d 419, 422.

In Brown v. City of Fairhope, supra, this court held specifically that sewage disposal is a corporate function of a municipality and that garbage disposal is a governmental function of a municipality. This court so held in the following words.

"The last objection raised the point that the maintenance and operation of the sewer lines was a governmental function and that prevents the defendants from being sued. The rationale of the argument is that since the cases of City of Tuscaloosa v. Fitts, 209 Ala. 635, 96 So. 771, and Ivory v. City of Montgomery, 35 Ala.App. 631, 51 So. 2d 559, hold that the collection of garbage by a municipality is a governmental, and not a corporate, function, and the case of Spear v. Ward, 199 Ala. 105, 74 So. 27, holds that the preservation of public health by the installation of sanitary systems of sewers, is within the police power of the municipal government, that the maintenance and operation of sanitary sewers is a governmental function. But our cases hold otherwise."

In Lauderdale County Board of Education v. Alexander, Ala., 110 So.2d 911, 917,

which we have hereinabove referred, this court said:

"We have held that when a city is engaged in a proprietary business, it is subject to its own zoning regulations; but that when engaged in a governmental function, it is not subject to its own zoning regulations. * * *."

III. We have examined the photographs introduced in evidence and it seems to us that the photographs show that a garbage dump as that term is usually used is not involved in this case. The photographs show that there are no residences on three sides of the area. A deep railroad cut 100 feet wide separates the city's land from the land of the three complainants. There is a sanitary landfill being operated on the land of the city. It is not a garbage dump. It seems to us that we have here an essential health and sanitary service, the discontinuance of which will adversely affect the health of a large number of inhabitants of the City of Birmingham.

We, accordingly, have concluded that the decree of the lower court should be modified to the extent herein set forth but not enjoining in its entirety the landfill garbage disposal operation on the land of the city.

Modified and affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.