WOODALL, Justice.
The City of Selma (“the City”) appeals from a summary judgment in favor of Dallas County (“the County”) in the City’s declaratory-judgment action challenging the right of the County to erect a communications tower at the Dallas County courthouse, which is located within the geographical limits of the City. We affirm.

I. Factual Background

In May 2006, the County began construction of a communications tower on the premises of the Dallas County courthouse. The City commenced this action, seeking to enjoin the construction of the tower on the ground that the location of the tower violated two of the City’s ordinances: Ord. 01-9091, “An Ordinance to Provide for Designation of Historic Properties or Historic Districts” (“the historic ordinance”), and Ord. COS 013-00/01, “A Local Ordinance Regulating the Siting of Wireless Telecommunications Facilities” (“the tower ordinance”). It also alleged that construction of the tower violated Ala. Const.1901, § 220.
The City and the County filed cross-motions for a summary judgment. The trial court granted the County’s motion and denied the City’s motion. It found that the tower ordinance and the historic ordinance were zoning ordinances and held that neither ordinance was enforceable against the County. It also held that construction of the tower did not offend § 220. From that judgment, the City appealed.
We provide the underlying facts, which are undisputed or unchallenged, as well as much of the relevant statutory authority, from the affidavit of Brett H. Howard, director of the Dallas County Department of Homeland Security and Emergency Management:
“1. [Brett H. Howard] ... serve[s] as the Director of the Dallas County Department of Homeland Security and Emergency Management. [He is] also a member of the Board of Commissioners of the Dallas County Telecommunications District, commonly known as the Dallas County E-911 Board, and [has] been designated as the ‘point of contact’ or ‘POC’ between Dallas County, Alabama, and the [Alabama] Department of *14 Homeland Security [‘the state department’]. - • •
“2. The Dallas County Department of Homeland Security and Emergency Management [‘the county department’] was created by the Dallas County Commission pursuant to § 31-9-10 of the [Alabama Emergency Management Act of 1955, Ala.Code 1975, § 31-9-1 et seq.,] as amended, which authorized and directed each political subdivision of this state to establish an organization for emergency management. [The county] department was created to perform emergency management functions within Dallas County, which was given those powers and authorities set forth in § 31-9 — 10(b) ..., including the power to appropriate and expend funds, make contracts, obtain and distribute equipment, materials and supplies for emergency management purposes; to provide for the health and safety of persons and property, including emergency assistance to the victims of any disaster; and to direct and coordinate the development of emergency management plans and programs in accordance with the policies and plans set by the federal and state emergency agencies. The authority of [the county] department is further defined in § 31-9-3(1) of the 1975 Code of Alabama, as amended, and includes:
“ ‘[the] carrying out [of] all emergency functions, other than [functions] for which [military forces or other] federal agencies are primarily responsible, to prevent, minimize, and repair injury and damage resulting from disasters caused by enemy attack, sabotage, or other hostile action, or by fire, flood, earthquake, or other natural cause. These functions include, without limitation, fire-fighting services; police services; communications; radiological, chemical and other special weapons of defense; evacuation of persons from stricken areas; emergency welfare services (civilian war aid); emergency transportation; plant protection; temporary restoration of public utility services; and other functions related to civilian protections, together with all other activities necessary or incidental to the preparation for and carrying out of the foregoing functions.’
“(Emphasis added [in Howard’s affidavit].)
“3. [The state department] is a state agency established by the Alabama Homeland Security Act of 2003, appearing in § 31-9A-1, et seq., Code of Alabama 1975, as amended [‘the AHSA’]. It was established in order to ensure that the preparations in the state of Alabama will be adequate to deal with events of the nature of the unprecedented and devastating attack of September 11, 2001, upon the people and the vital infrastructure of the United States and to protect and preserve the life, health, welfare, and property of the people of Alabama. (See § 31-9A-2, Code of Alabama, 1975, as amended.)
The duties of the [director of the state department] include:
“ ‘Coordinating] the efforts to protect the people of Alabama and the state’s critical infrastructure from terrorist attack, including, but not limited to, energy production, transmission and distribution systems, telecommunications, nuclear facilities, public and privately owned information systems, special public and private events, transportation hubs and networks, livestock, water, food supplies, and research institutions. (§ 31-9A-[5(c)(5) ], emphasis added [in Howard’s affidavit]).’
*15 “[The state department] was further established for the purpose of assisting, coordinating, and encouraging homeland security preparedness by state departments and agencies and political subdivisions of the state by authorizing the making of grants to the political subdivisions of this state for the purpose of promoting homeland security. (See § 31-9A-2(b).) As such, the [state department] is the principal state agency which coordinates the receipt and distribution of funds available from any source with regard to Homeland Security related items, issues, and services. (See § 31-9A-4(b).)
“4. The [AHSA] further provides for the coordination of functions and activities with the federal government and with federal legislation and regulations (see § 31-9A-8). [It also] empowers the [state-department] director to prepare a comprehensive plan and program for homeland security ‘to be integrated and coordinated with the plans of the federal government and of other states to the fullest possible extent’; and ‘to cooperate with the United States Department - of Homeland Security in matters pertaining to security and the defense of the state and nation.’ Section 31-9A-10 ... authorizes the [state-department] director to accept offers to the state and to its political subdivisions of equipment, supplies, materials, or funds by way of gift, grant, or loan for the purposes of homeland security.
“5. In fiscal year 2004, the [state department] set aside federal grant funds for the purchase of interoperable communications equipment for Alabama’s counties. This equipment is commonly known as ‘bridging equipment,’ designed to allow all emergency responders within each county to communicate with each other over existing radio frequencies. The greatest obstacle faced by emergency responders in responding to a disaster is the inability to communicate.... For example, ... the city police operate on a different frequency than the county sheriffs department[s] and county volunteer fire departments.... Interoperable communications are part of a multi-phased, multi-year plan by the National Department of Homeland Security.... [The County’s] plan to obtain a tower and bridging equipment is a part of Homeland Security’s plan to ensure county emergency responders can communicate with each other effectively across the state, and it meets the deadlines and goal of the National Homeland Security plan.... The Homeland Security Grant Program exists to help states to obtain resources ‘critical to building and sustaining capabilities to achieve the Interim National preparedness Goal and implement State and Urban Area Homeland Security Strategies.’ ... As a small cog in the larger machine, i.e., Homeland Security’s national goal of greater security, the lack of interoperable communications in Dallas County this year would set not only Dallas County back, but, also, the State of Alabama in its attempt to continue to advance along with the national goal of greater security in each locality.
“6. The interoperable communications plan developed by the [state department] is to provide funding for a communications bridge in every county. The tower and bridging equipment is critical because it will allow all emergency responders, including the Dallas County sheriffs department, the municipal police and fire departments, and the various volunteer fire departments to communicate with one another regardless of the radio frequency utilized by them. In addition, this interoperability would allow for emergency responders *16 who come to Alabama in the event of disaster to communicate, no matter on what frequency their communications systems may operate. The tower and bridging equipment will also provide means to tie communications together statewide and possibly nationwide. The [state department] reserved $112,000 for the acquisition of this bridging equipment and communications tower.
“7. [Howard] subsequently executed in [his] capacity as Dallas County POC a cooperative agreement with the [state department] for the allocation of funds in the amount of $75,000 to be used for the construction of [the] communications tower. It was a requirement of the grant that these funds be allocated for the purchase of a tower by March 1, 2006....
[[Image here]]
“9. The communications tower was erected adjacent to the Dallas County Courthouse Annex on May 5-6, 2006.... The placement of the communications tower at [that] location enables the [county department] to fulfill the purpose of the grant. This is a suitable location for the following reasons: The [county department] and the Dallas County sheriffs office [are] located in the Dallas County Courthouse Annex building; [the] location will allow voice communication throughout the entire county, benefitting all emergency responders in Dallas County, no matter what agency they work with ...; [and] this location is equipped with a T-l’ communications line, which is necessary to connect the communications bridging equipment with the dispatchers located at the 911 center.”
(Emphasis added except where otherwise noted.)
On appeal, the City contends that the trial court erred in holding that the County was immune from the application of the two ordinances and that it was not subject to § 220. The trial court’s finding that the historic ordinance and the tower ordinance are zoning ordinances is unchallenged. It is further undisputed that the communications tower was constructed in violation of both ordinances without the City’s permission. The County argues that the construction and operation of the tower is a “governmental function” and, therefore, that in constructing and operating the tower it need not comply with the ordinances.

II. Immunity

It was once “well settled that city zoning ordinances [did] not apply to the operation of a governmental function by a governing body, as opposed to a proprietary function.” Lane v. Zoning Bd. of Talladega, 669 So.2d 958, 959 (Ala.Civ.App.1995) (emphasis added). See City of Birmingham v. Scogin, 269 Ala. 679, 690, 115 So.2d 505, 514 (1959) (“The Alabama cases have long held that zoning does not apply to the operation of a governmental function by a municipality.”); Lauderdale County Bd. of Educ. v. Alexander, 269 Ala. 79, 86, 110 So.2d 911, 918 (1959) (“If a city engaged in a governmental function is not subject to its own zoning regulations, certainly a county engaged in a governmental function is not subject to a city’s zoning regulations.”); Water Works Bd. of Birmingham v. Stephens, 262 Ala. 203, 78 So.2d 267 (1955); Alabama Alcoholic Beverage Control Bd. v. City of Birmingham, 253 Ala. 402, 44 So.2d 593 (1950). “ ‘This distinction is of ancient vintage ....’” Cunningham v. City of Attalla, 918 So.2d 119, 125 (Ala.Civ.App.2005) (quoting 2 Kenneth H. Young, Anderson’s American Law of Zoning § 12.03 (4th ed.1996)). The City, however, questions whether the rule “remains viable” in light of Jackson v. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975), *17 City’s brief, at 13, and, if it does, argues that the construction and operation of the communications tower is not a governmental function. The first question, therefore, concerns the continued viability of the governmental/proprietary-function distinction.

A. Continued, Viability of the Governmental!Proprietary-Function Dichotomy

According to the City, Jackson called into question the continued viability of a distinction between governmental functions and proprietary functions. We disagree. To be sure, Jackson “abolished the judicial doctrine of municipal immunity” from tort liability, Neighbors v. City of Birmingham, 384 So.2d 113, 113 (Ala.1980) (discussing Jackson), which traditionally rested on the distinction between governmental and proprietary functions. In so doing, however, Jackson did no more than give effect to the intent of the legislature evident in Ala.Code 1940, Tit. 37, § 502, now codified at Ala.Code 1975, § 11-47-190. That section provides, in pertinent part:
“No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation unless said injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty....”
(Emphasis added.) This Court in Jackson merely acknowledged what was obvious on the face of the statute, that is, that the legislature had abrogated tort immunity for municipalities to the extent the alleged wrongful acts occurred “through the neglect, carelessness or unskillfulness of ... agent[s], officer[s] or employeefe] of the municipality engaged in work therefor and while acting in the line of [their] dut[ies].” The Court “recognize[d] the authority of the legislature to enter the entire field, and further recognize[d] its superior position to provide with proper legislation any limitations or protections it deem[ed] necessary.” Jackson, 294 Ala. at 600, 320 So.2d at 75.
We are directed to no legislation suggesting that the legislature has acted similarly with respect to immunity from zoning regulations. On the contrary, the Alabama Homeland Security Act of 2003, Ala. Code 1975, § 31-9A-1 et seq. (“the AHSA), includes a section titled “Immunity of state from liability.” That section provides: “All functions under this chapter and all other activities relating to homeland security are declared to be governmental functions and protected by the State of Alabama governmental immunity.” § 31-9A-13 (emphasis added). Additionally, § 31-9-16(a), a part of the Alabama Emergency Management Act of 1955, provides: “All functions under this chapter and all other activities relating to emergency management are hereby declared to be governmental functions.” (Emphasis added.)
It might be said that such statements are not conclusive upon this Court for all ;purposes, that “the question is judicial and not legislative in its nature, and that the Legislature cannot by a declaration make a public governmental function out of one which is inherently merely corporate in its nature.” Williams v. City of Birmingham, 219 Ala. 19, 21, 121 So. 14, 16 (1929). At a minimum, however, such statements may be regarded as evidence indicating that the legislature did not intend to abrogate the distinction between governmental and proprietary functions for all purposes.
Courts have also recognized the governmental/propriety-function dichotomy since Jackson. For example, in Pennick v. City of Florala, 529 F.2d 1242 (5th Cir.1976), *18 the United States Court of Appeals for the Fifth Circuit held that the operation of a sanitary landfill by the City of Florala “in a neighborhood zoned for residential use” was within the municipality’s authority, because the operation of the landfill was “not subject to” the municipality’s “own zoning” regulations. 529 F.2d at 1243. In so holding, the court rejected the plaintiffs’ “suggestion]” that the underlying principles may have been abrogated by Jackson. 529 F.2d at 1244. The court stated: “Since the rules on which we rely do not involve the line of authority or reasoning repudiated in Jackson, we believe that they remain good.” 529 F.2d at 1244.
Moreover, in Jefferson County v. City of Birmingham, 256 Ala. 436, 55 So.2d 196 (1951), this Court recognized a difference between tort liability and zoning for purposes of a governmental-function analysis. Also, in Neighbors, supra, decided five years after Jackson, this Court rejected the argument that Jackson “absolutely abolished governmental immunity in Alabama.” 384 So.2d at 113. In other words, the Court rejected the contention that Jackson had abrogated the rule, settled in McCarter v. City of Florence, 216..Ala. 72, 112 So. 335 (1927), that a municipality could not be liable for malicious prosecution. 384 So.2d at 113-14. Neighbors reaffirmed the applicability of § 11-47-190 in the tort context and refused to expand the statute beyond its obvious scope. See also Hilliard v. City of Huntsville, 585 So.2d 889 (Ala.1991) (city was immune from liability for alleged negligent inspection of wiring at an apartment complex).
In Town of Mulga v. Town of Maytown, 502 So.2d 731 (Ala.1987), a case more on point, this Court based its rationale, in part, on the distinction between governmental functions and proprietary functions. In that case, the Town of Maytown “enacted a business license ordinance imposing an excise tax on businesses engaged in the manufacture or distribution of gas within its municipal limits.” 502 So.2d at 732. One of the businesses purportedly subject to the tax was the Town of “Mulga, a municipal corporation, [which was] engaged in the business of selling and distributing gas to customers residing in Maytown .... ” 502 So.2d at 732. May-town sued Mulga, after “Mulga refused to purchase a license” on the ground that it was exempt from the ordinance. The trial court held that Mulga was not exempt, and this Court agreed.
In so doing, this Court stated:
“It appears well established that the state may levy an excise tax on a municipality, provided the intention to tax is clear and no constitutional inhibition exists. Likewise, it also appears that when the power of the state to tax is delegated to a municipality, as in this case, the intention to allow that municipality to levy a tax on another municipality must clearly appear.
“In the present case, Maytown was delegated the authority pursuant to § 11-51-90, Code 1975, to license any ‘business ... not prohibited by the Constitution or laws of the state which may be engaged in or carried on in the city or town.’ Maytown has by clear language imposed an excise tax on ‘businesses’ engaged in the distribution of gas within its municipal limits. While it is true, as Mulga insists, that the ordinance does not specifically refer- to municipalities, we do not consider that omission to be fatal. ‘Where a municipality engages in the business of furnishing electricity, lights, water, or gas to the public, it is not then discharging or exercising governmental functions or powers, but is exercising proprietary or business powers, and as to such business it is governed by the same rules of *19 law which are applicable to ordinary business corporations.’ Town of Hack-leburg v. Northwest Gas. Dist., [277 Ala. 355, 170 So.2d 792 (1964)]; City of Decatur v. Parham, 268 Ala. 585,109 So.2d 692 (1959).
[[Image here]]
“Therefore, it is clear to us, and we so hold, that in enacting § 11-51-90, supra, the legislature intended for a municipality like Mulga (i.e., one which is engaged in a business within the corporate limits of another municipality) to be subject to taxation as is any other business.”
502 So.2d at 734 (emphasis added). In other words, Mulga was subject to the provisions of the Maytown ordinance because it was engaged in a proprietary, as opposed to a governmental, function.
Since Jackson, the Court of Civil Appeals has, at least three times, directly applied the distinction between governmental functions and proprietary functions in the zoning context in order to hold that a county, in the case of Lane v. Zoning Board of Adjustment of Talladega, supra; a municipality, in the case of Cunningham v. City of Attalla, supra; and a city board of education, in the case of Alves v. Board of Education for Guntersville, 922 So.2d 129 (Ala.Civ.App.2005), were exempt from municipal zoning regulations in the operation of a governmental function.[1] The City cites no contrary authority. It is evident, therefore, that neither the judiciary nor the legislature has heretofore manifested an intent to abrogate the immunity from zoning ordinances that has long been afforded to political subdivisions in the operation of their governmental functions. The City does not, in fact, urge us to do so at this time. Consequently, we hold that Jackson did not abrogate the distinction between governmental functions and proprietary functions for the purpose of applying zoning ordinances. The next question is whether the County’s construction and operation of the communications tower is a governmental function.

B. Status of the Tower

“The governmental functions of a municipal corporation include the promotion of the public peace, health, safety, and morals, as well as the expenditure of money for public improvements, the expense of which ultimately is borne by the property owners.” 56 Am.Jur.2d Municipal Corporations § 183 (2000) (emphasis added). “A function is a governmental function if it is the means by which the governing entity exercises the sovereign power for the benefit of all citizens.” Lane, 669 So.2d at 959-60. It is “done by authority of law .... [a]nd ... not ... for profit .... It is not of a proprietary nature, but under the police power to promote the health and well-being of the people.” Downey v. Jackson, 259 Ala. 189, 193, 65 So.2d 825, 827 (1953). “The police powers of a city are among its major governmental functions. Broadly speaking, they extend to all appropriate ordinances for the protection of the peace, safety, health, and good morals of the people affected thereby. The general ‘welfare’ is a generic term often employed in this connection.” City of Homewood v. Wofford Oil Co., 232 Ala. 634, 636, 169 So. 288, 290 (1936).
“Proprietary ... functions include essentially commercial transactions involving the purchase or sale of goods and services and other activities for the commercial benefit of a particular govern *20 ment agency. Whereas in its sovereign role, the government carries out unique governmental functions for the benefit of the whole public, in its proprietary capacity the government’s activities are analogous to those of a private concern.”
Federal Deposit Ins. Corp. v. Harrison, 735 F.2d 408, 411 (11th Cir.1984) (emphasis added).
Examples of governmental functions in cases challenging the entity’s operating authority include a “sanitary landfill garbage disposal” expressly authorized by statute, operated by a municipality, Scogin, supra; the operation, expressly authorized by statute, of a baseball diamond by the “Park and Recreation Board of the City of Birmingham,” Downey, supra; the location, construction, and operation by a county board of education of a facility in which to store, repair, and maintain school property, such as school buses and supplies, Alexander, supra; the operation, expressly authorized by statute, of a garbage incinerator by the City of Bessemer, City of Bessemer v. Abbott, 212 Ala. 472, 103 So. 446 (1925); the construction and operation of a jail by the county, Lane, supra; the use by a municipality of a building as a warehouse, Cunningham, supra; and the choice of a location for a new school building by a city board of education, Alves, supra. Cf. State ex rel. Hyland v. Baumhauer, 244 Ala. 1, 8, 12 So.2d 326, 330 (1942) (“A fire department, when organized and functioning, is performing a governmental rather than a proprietary function.”).
On the other hand, “when a city is engaged in the business of supplying for compensation water service to the people, within its lawful power, it is engaged in a proprietary business.” Stephens, 262 Ala. at 209, 78 So.2d at 272 (emphasis added). Similarly, the operation of a sewage-disposal plant is, for zoning purposes, a proprietary function. Jefferson County v. City of Birmingham, supra.
The trial court held, “as a matter of law, that communicating with emergency service providers by governmental bodies is a governmental function and not a proprietary function.” We agree.
Kent County Aeronautics Board v. Department of State Police, 239 Mich.App. 563, 609 N.W.2d 593 (2000), aff'd sub nom. Byrne v. State, 463 Mich. 652, 624 N.W.2d 906 (2001), involved a challenge to the authority of the “Michigan Department of State Police” (“the State Police”) to construct and operate a “475-foot radio communications tower.” 239 Mich.App. at 567, 609 N.W.2d at 597. The tower was to be 1 of 181 such towers in “an integrated radio tower network communications system,” which was intended to “provide radio coverage over the entire state enabling state and local public safety officers, as well as law enforcement agencies and other state departments, to communicate with each other simultaneously.” Id. A state statute expressly authorized the State Police to “ ‘sit[e] the buildings and equipment necessary’ ” for the “ ‘construction, implementation, operation and maintenance of the Michigan public safety communications system.’ ” 239 Mich.App. at 574, 609 N.W.2d at 600. The appellate court, in rejecting various challenges to the authority for the construction, held, among other things, that “the construction of the communications tower by the State Police ... was authorized by statute ... and clearly constituted a governmental function.” 239 Mich.App. at 586, 609 N.W.2d at 605 (emphasis added).
This dispute arose out of federal and state legislation primarily generated by the terrorist attacks that occurred on September 11, 2001. First, Congress passed the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2135, codified, as *21 amended by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub.L. No. 108-458, 118 Stat. 3638, at 6 U.S.C. § 101 et seq. (“the Act”). The Act created the United States Department of Homeland Security and assigned it the duty of, among other things, “prevent[ing] terrorist attacks within the United States,” 6 U.S.C. § 111(b)(1)(A), and “reducing] the vulnerability of the United States to terrorism.” § 111(b)(1)(B). To that end, the Act charged the Secretary of Homeland Security (“the Secretary”) with the duty to:
“coordinate ... with State and local government personnel ... by—
“(1) coordinating ... to ensure adequate planning, [and] equipment ...; “(2) coordinating and, as appropriate, consolidating, the Federal Government’s communications and systems of communications relating to homeland security with State and local government personnel, agencies, and authorities ...; and “(3) distributing or, as appropriate, coordinating the distribution of, warnings, and information to State and local government personnel, agencies and authorities and to the public.”
6 U.S.C. § 112 (emphasis added).
Congress found that “(A) many first responders working in the same jurisdiction or in different jurisdictions cannot effectively and efficiently communicate with one another”-, and that “(B) their inability to do so threatens the public’s safety and may result in unnecessary loss of lives and property.” 6 U.S.C. § 194(i)(l) (emphasis added). Thus, it was the “sense of Congress that interoperable emergency communications systems and radios should ... be deployed as soon as practicable for use by the first responder community .... ” § 194(i)(2) (emphasis added). The Act defines “interoperable communications” as “the ability of emergency response providers and relevant Federal, State, and local government agencies to communicate with each other ..., through a dedicated public safety network utilizing information technology systems and radio communications systems, and to exchange voice, data, or video with one another on demand, in real time, as necessary.” § 194(g)(1).
The Act further authorized the Secretary to “establish a comprehensive national approach to achieving public safety interoperable communications,” § 194(a)(1)(A) (emphasis added); to “develop ... appropriate minimum capabilities for communications interoperability for Federal, State, and local public safety agencies,” § 194(a)(1)(C); and to “establish coordinated guidance for Federal grant programs for public safety interoperable communications,” § 194(a)(1)(H) (emphasis added). The Act provided for the awarding of “interoperability grants” to states and local governments “for the purposes of enhancing interoperable communications capabilities for emergency response providers.” § 194(e)(1). Subsequently, the Alabama Legislature passed its own version of the Act, namely, the AHSA, “to assist, coordinate, and encourage homeland security preparedness by ... authorizing the making of grants, as funds are appropriated for such purpose, to any political subdivision of the state ....”§ 31-9A-2(b).
It is undisputed that the communications tower at issue in this case is “interoperable emergency communications” equipment of the sort contemplated by Congress and funded by grants made available through the Act and the AHSA. Operation of the tower is not a business for profit. The City concedes that the tower is federally funded, and it does not allege that the cost of constructing and operating the tower will be charged to the City or its inhabit *22 ants. The “customers” are emergency first responders, who fulfill traditional police-power functions of promoting “public peace, health, [and] safety.” 56 Am.Jur.2d Municipal Corporations § 183. It is not analogous to a city-operated “water service business,” which is “proprietary in nature.” Stephens, 262 Ala. at 208, 78 So.2d at 272. It redounds to the benefit of not only citizens of Dallas County, but also emergency personnel from other counties or states in any multijurisdietional response to a crisis in Dallas County.
The undisputed purpose of the communications tower is to remedy the specific problem addressed by Congress in 6 U.S.C. § 194, that is, the inability of emergency first responders to communicate with one another in a time of crisis. Thus, the construction and operation of the tower is “done by authority of law .... to promote the health and well-being of the people.” Downey v. Jackson, 259 Ala. at 193, 65 So.2d at 827. It is a vital “cog” in the larger machine — an indispensable link in the national communications network envisioned by Congress and reflected in the Act.
Although more could be said in this regard, we can readily conclude that the construction and operation of the communications tower — impelled by federal and state legislation in response to the urgen-cies of the post-9/11 era — is a governmental function.[2] Accord Kent County Aeronautics Board v. Department of State Police, supra. Consequently, the trial court correctly held that the tower ordinance and the historic ordinance are not enforceable against the County.

III. Alabama Constitution, § 220

Finally, the City contends that the trial court erred in holding that the construction and operation of the tower did not offend § 220 of the Alabama Constitution of 1901, which provides:
“No person, firm, association, or corporation shall be authorized or permitted to use the streets, avenues, alleys, or public places of any city, town, or village for the construction or operation of any public utility or private enterprise without first obtaining the consent of the proper authorities of such city, town, or 'village.”
(Emphasis added.) The City insists that the communications tower is a “public utility” and, therefore, that § 220 prohibits the construction and operation of the tower without the City’s permission.
A “public utility” is defined as a “ business organization (as an electric company) performing a public service and subject to special governmental regulation.” Mer-riamr-Webster’s Collegiate Dictionary 1006 (11th ed.1997) (emphasis added). It is also more specifically defined as follows:
“‘A privately owned and operated business whose services are so essential to the general public as to justify the grant of special franchises for the use of public property or of the right of eminent domain, in consideration of which the owners must serve all persons who apply, without discrimination. It is always a virtual monopoly.
“ ‘A business or service which is engaged in regularly supplying the public with some commodity or service which is of public consequence and need, such as electricity, gas, water, transportation, or telephone or telegraph service.... Any agency, instrumentality, business, industry or service which is used or conducted in such manner as to affect the community at large, that is, which is not *23 limited or restricted to any particular class of the community. The test for determining if a concern is a public utility is whether it has held itself out as ready, able and willing to serve the public. The term implies a public use of an article, product, or service, carrying with it the duty of the producer or manufacturer, or one attempting to furnish the service, to serve the public and treat all persons alike, without discrimination.’”
Coastal States Gas Transmission Co. v. Alabama Pub. Serv. Comm’n, 524 So.2d 357, 360-61 (Ala.1988) (quoting Black’s Law Dictionary 1104 (5th ed.1979)) (emphasis added).
In addition, the legislature has supplied the following definition and examples from Title 37, Chapter 4, involving “Public Utilities Other than Transportation Companies or Motor Vehicle Carriers”:
“(7) Utility. Such term shall mean and include every person, not engaged solely in interstate business, that now or may hereafter own, operate, lease or control:
“a. Any plant, property or facility for the generation, transmission or distribution, sale or furnishing to or for the public of electricity for light, heat or power or other uses, including any conduits, ducts, or other devices, materials, apparatus, or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat, or power, or other uses.
“b. Any plant, property, or facility for the manufacture, storage, distribution, sale or furnishing to or for the public of natural or manufactured gas for light, heat or power or other uses.
“c. Any plant, property or facility for the supply, storage, distribution, or furnishing to or for the public of water for manufacturing, municipal, domestic or other uses.
“d. Any plant, property or facility for the production, transmission, conveyance, delivery or furnishing to or for the public of steam for heat or power, or other uses.
“e. Any public wharf, dock or terminal.
“f. Any boat line propelled by any power and not regulated by the laws of this state heretofore or hereafter enacted as a steamboat or steam packet line.
“The term ‘utility’ shall also mean and include two or more utilities rendering joint service.”
Ala.Code 1975, § 37-4-1(7).
The City does not cite a case from this, or any other, jurisdiction holding that the operation of a tower to provide “interoperable communications” among emergency responders is a public utility. Indeed, it is often stated that “[t]he operation by a municipality of a public utility is a proprietary, not a governmental, function.” Schmidt v. Village of Kimberly, 74 Idaho 48, 60, 256 P.2d 515, 522 (1953) (emphasis added). See Cobb County Rural Elec. Membership Corp. v. Board of Lights & Water Works of Marietta, 211 Ga. 535, 87 S.E.2d 80 (1955); IBP, Inc. v. City of Council Bluffs, 511 N.W.2d 413 (Iowa Ct. App.1993); 2 Eugene McQuillin, The Law of Municipal Corporations § 4:154 (3d ed. rev.vol.2006) (“a municipality, in the operation of a public utility, acts in its private and proprietary capacity rather than in a legislative or governmental capacity”).
Having determined in the preceding part of this opinion that the construction and operation of the communications tower is a governmental function, we would have to strain to hold, in this part, that it is proprietary in nature. It is difficult to avoid the logic that if the operation of a public utility is a proprietary function, then *24 it is not a public utility if it is not a proprietary function. The City cites only two cases in support of its argument that the communications tower is a “public utility,” namely, Mobile County v. City of Sar-aland, 501 So.2d 438 (Ala.1986) (drainage pipe under a city street), and Coastal States Gas Transmission Co., supra (pipeline owned and operated for the sale of “natural gas to select customers under private contracts”). In both cases, however, this Court held that the concern at issue was not a public utility.
The City focuses on the “public” aspect of the definition of a public utility. It states: “Dallas County made it clear that [it is] constructing this radio tower ‘for the public good’ and for the welfare of the county as a whole .... and the County made it clear that it was ready, able and willing to serve the public.” The City’s brief, at 24-25. In response, the County states: “If this Court was to focus on that one element as argued by [the City], no function of civil government would be safe from falling within that definition,” including every operation or facility that our cases have defined as serving a governmental function. The County’s brief, at 60. We agree with the County.
In City of Bessemer v. Personnel Board for Jefferson County, 240 Ala. 411, 199 So. 815 (1941), this Court said: “A proprietary junction or power of a city operated for the public is none the less a public function though for some purposes it may not be strictly a governmental function.” 240 Ala. at 413, 199 So. at 816 (emphasis added). “[T]he distinction between governmental and proprietary functions of a city was worked out by the courts to support liability for negligence, and in order that injustice may not result. But all its functions are public and are dependent upon authority by the state.” 240 Ala. at 413, 199 So. at 816 (emphasis added).
In fact, in operating the communications tower, the County does not purport to “serve the public,” in the sense that it “treat[s] all persons alike, without discrimination.” Black’s Law Dictionary 1104 (5th ed.l979)(quoted in Coastal States, 524 So.2d at 361). The interoperability feature, the tower’s raison d’etre, specifically serves only emergency responders, such as fire, law-enforcement, and rescue personnel. Members of the general public are not charged for the operations of the tower and have no right to demand interoperable service from the tower. Thus, consistent with the logic of Part II.B. of this opinion, and based, moreover, on the facts and authorities presented by the parties in this case, we hold that the communications tower is not a public utility.

IV. Conclusion

In conclusion, the interoperable communications tower constructed at the Dallas County courthouse is neither proprietary in nature, nor is it a public utility. The trial court did not err, therefore, in entering a summary judgment for the County. That judgment is affirmed.
AFFIRMED.
COBB, C.J., and SEE, SMITH, and PARKER, JJ., concur.

. In none of these cases was the Court of Civil Appeals presented with the argument that the distinction did not survive Jackson.

. We need not, and do not, decide whether the legislature may conclusively categorize all conduct arising under the AHSA as a governmental function.