WELCH, Presiding Judge.
 

 Benson W. Peak was convicted in the Tuscaloosa Municipal Court of failing to register a wastewater system, i.e., a septic tank, a violation of §§ 13-51(3) and (16) of the Tuscaloosa Municipal Code. He appealed for a trial de novo in the circuit court and, after a jury trial, was again convicted of failing to register a wastewa-ter system. The circuit court ordered him to pay a $250 fine plus court costs.
 

 The undisputed evidence presented at trial indicates that Peak owns property in the drainage basin
 
 [1]
 
 of Lake Tuscaloosa located within the police jurisdiction of the City of Tuscaloosa (“the City”).
 
 [2]
 
 Peak has a septic tank on his property; he did not register that septic tank with the City in
 
 *9
 
 accordance with § 13-51(3) of the Tuscaloosa Municipal Code, as amended by ordinance no. 6943,
 
 [3]
 
 which provides:
 

 “Registration. On or before August 31, 2006, all Owners within the Drainage Basin upon which is located an onsite wastewater system shall register the same with the Lakes Division [the City of Tuscaloosa’s Water and Sewer Department’s Division of Lakes]. On each occasion of a change in ownership of property within the Drainage Basin upon which is located an onsite wastewa-ter system, the Owner of such property shall register the same with the Lakes Division.”
 

 (C. 308.) Section 13-51(16) of the Tuscaloosa Municipal Code, as added by ordinance no. 6665 and amended by ordinance no. 6943, provides, in relevant part, that “[i]t shall be unlawful to fail to register as required in Sec. 13-51(3).” (C. 308.) In addition, § l-8(a) of the Tuscaloosa Municipal Code provides, in relevant part:
 

 “Whenever in this Code, or in any ordinance of the city, an act is prohibited or is made or declared to be unlawful or an offense or a misdemeanor, whenever in such code or ordinance the doing of any act is required, or the failure to do any act is declared to be unlawful, where no specific penalty is provided therefor, the violation of any such provision of this Code or any such ordinance shall be punished by a fine of not more than five hundred dollars ($500.00), to which may be added in the discretion of the judge of the court trying the case, confinement in the city jail or to hard labor for the city for a period not exceeding six (6) months....”
 

 (C. 324.) The purpose of enacting § 13-51 is set out in ordinance no. 6619, as follows:
 

 “WHEREAS, Lake Tuscaloosa (Lake) is the most vital capital asset of Tuscaloosa County. Completed in 1970, the Lake consists of 5,885 acres with a full pool capacity of 40 billion gallons of water and a withdrawal capability of 200 millions gallons per day. The Lake serves a critical role as the primary source of drinking water for the vast majority of the population of Tuscaloosa County. In addition, the Lake also functions as a major public recreational center for many residents and visitors; and,
 

 “WHEREAS, over the last thirty (30) years there has been significant residential and commercial development in and around the Lake with the majority of the development activity utilizing septic tanks for sanitary sewer disposal. Within the Lake’s entire drainage basin more development is also taking place, including agricultural and commercial activities and the domestic use of herbicides, fertilizer and pesticides have increased with development as well; and,
 

 “WHEREAS, on January 22, 2004, the Tuscaloosa County Health Department (Department) presented a report to the City Council of the City of Tuscaloosa (City) as the owner of the Lake, entitled ‘Tuscaloosa County Board of Health, Lake Tuscaloosa Plan’ (Plan). The Plan reported that ongoing monitoring of the water of the Lake ‘demonstrated higher than normal bacterial and other quality standards. There were several locations which exceeded the recommended level of fecal coliform bac
 
 *10
 
 teria for “full body contact” by the EPA [Environmental Protection Agency].’ The Plan proposed a public notification program to post notices of water quality findings. In addition, the Department made specific recommendations to the City to address, on a long term basis, sources of pollution and contamination to the Lake which are identified as being primarily failing septic tanks, lack of use of Best Management Practices (BMP) for site development and the use of herbicides, fertilizers and pesticides; and,
 

 “WHEREAS, as a consequence of these events, the City Council has determined that it is imperative to protect the public health, safety and welfare by enacting certain regulations regarding the installation, operation, and maintenance of onsite wastewater systems in the drainage basins of the City’s water supply reservoirs.”
 

 (C. 278.)
 

 Before trial, Peak moved to dismiss the complaint against him charging him with failing to register his septic tank, alleging that § 13-51 was invalid. Specifically, he argued: (1) that the City did not have the authority to enact an ordinance to protect its municipal water supply because, he said, providing water to its citizens is a proprietary function of a municipality and not a governmental function; (2) that the entire field of wastewater regulation has been preempted by state law; (3) that § 13-51 violates principles of due process and equal protection under both the United States and Alabama Constitutions because, he said, it does not bear a rational relation to a legitimate governmental interest; and (4) that § 13-51(3) violates the Fifth Amendment of the United States Constitution because, he said, it requires that he provide information of an incriminating nature. The trial court did not conduct an evidentiary hearing on Peak’s motion, but allowed the parties to file extensive briefs, with exhibits attached, and then issued a written order denying Peak’s motion, finding all of his challenges to § 13-51 to be meritless.
 

 Peak reasserts on appeal all of his challenges to the validity of § 13-51. Before addressing those specific arguments, we note that Peak’s arguments appear to challenge not only the registration requirement in § 13-51(3), which he was convicted of violating by virtue of § 13-51(16), but also a service requirement in § 13-51(6) of the Tuscaloosa Municipal Code, as amended by ordinance no. 6665, which requires service and inspection of all septic tanks within the drainage basin every three years and certification to the City that such service and inspection has been completed.
 
 [4]
 
 However, as the City pointed
 
 *11
 
 out in its brief in response to Peak’s motion to dismiss, because Peak was never charged with or convicted of violating § 13-51(6), he has no standing to challenge that section. See
 
 J.L.N. v. State,
 
 894 So.2d 738, 741 n. 3 (Ala.Crim.App.2002) (“In addition to challenging § 15 — 20—26(b), Ala.Code 1975, under which he was indicted, the appellant also appears to argue-that §§ 15-20-23, 15-20-25, and 15-20-26(a), (c), and (d), Ala.Code 1975, are unconstitutional. However, he was not charged with violating any of those provisions of the [Community Notification Act]. Therefore, he does not have standing to challenge those provisions, and we will not review his constitutional challenges regarding those provisions.”), rev’d on other grounds, 894 So.2d 751 (Ala.2004); and
 
 State v. Wilkerson,
 
 54 Ala.App. 104, 105, 305 So.2d 378, 380 (1974) (“ ‘As a general rule, in criminal prosecution, accused has the right to assert the invalidity of the law, regulation, or rule under which he is being prosecuted [but] ... [a]n accused affected by one portion of a statute may not plead the invalidity of another portion of the same statute not applicable to his case ... ”’ (quoting 16 C.J.S.
 
 Constitutional Law
 
 § 84)). See also
 
 Byrd v. State,
 
 [Ms. CR-07-0113, May 1, 2009]-So.3d-(Ala.Crim.App.2009); and
 
 Taylor v. State,
 
 442 So.2d 128 (Ala.Crim.App.1983). Therefore, we do not consider or address Peak’s arguments to the extent they relate to § 13-51(6).
 

 Standard of Review
 

 “An appellate court reviews the legislative actions of a municipality in an extremely deferential manner.”
 
 City of Attalla v. Dean Sausage Co.,
 
 889 So.2d 559, 565 (Ala.Civ.App.2003). “Municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable.”
 
 Cudd v. City of Homewood,
 
 284 Ala. 268, 270, 224 So.2d 625, 627 (1969). “Municipal ordinances are presumed to be validly and properly enacted and unless invalid on its face the burden is upon the person attacking one to show its invalidity.”
 
 Burnham v. City of Mobile,
 
 277 Ala. 659, 662, 174 So.2d 301, 303 (1965). In addition, “[o]ur review of constitutional challenges to legislative enactments is de novo.”
 
 Richards v. Izzi,
 
 819 So.2d 25, 29 n. 3 (Ala.2001).
 

 I.
 

 Peak contends that the City lacked the authority to enact and enforce § 13-51(3) because, he says, in doing so, the City was acting in a proprietary function, not a governmental function. According to Peak, supplying water to its residents is a proprietary, not a governmental, function of a municipality, and a municipality has no
 
 *12
 
 authority to enact ordinances related to, or in furtherance of, a proprietary function.
 

 “A municipal corporation is but a creature of the State, existing under and by virtue of authority and power granted by the State.”
 
 Hurvich v. City of Birmingham,
 
 35 Ala.App. 341, 343, 46 So.2d 577, 579 (1950). A municipality “derives all of its power from the state, and no municipality can legislate beyond what the state has either expressly or impliedly authorized.”
 
 Arrington v. Associated Gen. Contractors of America,
 
 403 So.2d 893, 902 (Ala.1981). Put another way, “[municipal corporations may exercise only such powers as are expressly granted to them by the Legislature or necessarily implied in or incident to the powers expressly conferred, and those indispensably necessary to the accomplishment of the objects of the municipality.”
 
 Phenix City v. Putnam,
 
 268 Ala. 661, 664, 109 So.2d 836, 838 (1959). “Although municipalities exercise ‘such power ... as is conferred upon [them] by law,’ a municipality need not predicate its every action upon some specific express grant of power. Alabama’s cities possess certain implied powers that derive from the nature of the powers expressly granted to them by the legislature.”
 
 Wilkins v. Dan Haggerty & Assocs., Inc.,
 
 672 So.2d 507, 509 (Ala.1995). Indeed, “[i]t is elementary that, in addition to the powers expressly conferred on them by the legislature, municipal corporations have, by implication, all powers reasonably necessary to the carrying out of those powers expressly granted, and also, as incidental powers, all powers necessary for carrying out the corporate purposes.”
 
 City of Bessemer v. Birmingham Elec. Co.,
 
 248 Ala. 345, 354, 27 So.2d 565, 573 (1946).
 

 “A municipality has the authority to enact ordinances pursuant to its police powers,”
 
 Congo v. State,
 
 409 So.2d 475, 477-78 (Ala.Crim.App.1981), and “one of the most important objects of municipal government is the preservation of the public health.”
 
 Spear v. Ward,
 
 199 Ala. 105, 74 So. 27, 30 (1917).
 

 “The preservation of the public health by the installation and maintenance of sanitary systems of sewers and closets is well recognized as one of the most important duties of municipal governments, and falls clearly within the police powers of government, subject to which the inhabitant and citizen of the municipality holds his individual rights to property and to liberty.
 

 “Consequently, statutes and ordinances dealing with and relating to such subjects, together with provisions for the enforcement thereof, will be indulged by the courts, with the presumptions in their favor, as to their necessity, propriety, and validity, in the absence of a showing to the effect that they are unreasonable, arbitrary, unduly oppressive, or inconsistent with the legislative policy of the state. It must be made to appear to the courts that this police power has been manifestly transcended or abused, before courts will set aside or declare void ordinances which are intended to promote the public health....
 

 [[Image here]]
 

 “... [T]he Legislature has clothed municipalities with the power and authority to pass ordinances, by-laws, etc. The municipal authorities to this extent exercise police power of the state; and they not only have the power, but the law enjoins the duty and obligation on them, to promptly abate or remove all nuisances by which the public health may be affected, and to thus provide for the safety, comfort, and convenience of the inhabitants. All the inhabitants therefore have an interest in seeing that proper ordinances are passed, as well as that, when passed, such ordinances are
 
 *13
 
 enforced against all, as the failure to conform thereto by a few may inflict injury and ill health upon the many....”
 

 Spear,
 
 199 Ala. 105, 74 So. at 29-30.
 

 Section 11-45-1, Ala.Code 1975, provides:
 

 “Municipal corporations may from time to time adopt ordinances and resolutions not inconsistent with the laws of the state to carry into effect or discharge the powers and duties conferred by the applicable provisions of this title and any other applicable provisions of law and to provide for the safety,
 
 preserve the health,
 
 promote the prosperity, and improve the morals, order, comfort, and convenience of the inhabitants of the municipality, and may enforce obedience to such ordinances.”
 

 (Emphasis added.) In addition, “[a]ll cities and towns in this state shall have the power to maintain the health and cleanliness of the city or town within its limits and within the police jurisdiction thereof,” § 11-47-130, Ala.Code 1975, and have the power “[t]o adopt such ordinances and regulations as the council or other governing body may deem necessary to insure good sanitary condition in public places or in private premises in the cities and towns.” § 11 — 47—131(3), Ala.Code 1975. Municipalities also have the power to purchase, create, and/or maintain public-recreation areas. See § 11-47-210 et seq., Ala.Code 1975.
 

 In furtherance of the authority to protect public health, municipalities “have the right to establish, purchase, maintain, and operate waterworks or contract for a supply of wholesome water for their inhabitants.” § 11-50-1, Ala.Code 1975. Similarly, § 11-50-50, Ala.Code 1975, provides:
 

 “All cities and towns may make all needful provisions for the drainage of such city or town, may construct and maintain efficient sanitary and stormwa-ter sewers or sewer systems, either within or without the corporate limits of the city or town, may construct and maintain ditches, surface drains, aqueducts, and canals and may build and construct underground sewers through private or public property, either within or "without the corporate limits of such city or town, but just compensation must first be made for the private property taken, injured, or destroyed.”
 

 “Any city or town may extend or alter its sewer system and extend the mains whenever in the opinion of the city or town it may be necessary or expedient to do so,” § 11-50-52, Ala.Code 1975, and “[a]ll cities and towns of this state shall have the power to establish or build drains and may require private or public premises to be connected with the sewer system for proper drainage or sanitation and shall have the power to regulate the manner of connection therewith.” § 11-50-53, Ala.Code 1975. Section 11-50-54, Ala.Code 1975, further provides:
 

 “All cities and towns of this state shall have the power to prescribe the location and manner in which drainage from private premises may be disposed of and to prescribe the manner in which plumbing shall be constructed and to forbid the use of the same while out of order or defective and may discontinue or forbid the use of sinks, pits, cesspools, dry wells, and surface closets and may regulate and compel the connection of private or public premises with the sewer system of the town or city....”
 

 Most importantly, however, § 11-50-55, Ala.Code 1975, specifically provides:
 

 “All cities and towns of this state
 
 shall have the power to regulate
 
 privies, water closets, and
 
 septic tanks
 
 and the construction thereof and to compel the installation of same and to regulate the
 
 *14
 
 connection of such water closets with such septic tanks or with the sewerage system of the city or town.... ”
 

 (Emphasis added.)
 

 It is clear from the above statutory provisions that the City had the authority to adopt ordinances to regulate and control sanitation within its police jurisdiction in order to preserve and protect Lake Tuscaloosa — both because the Lake is the source of the City’s water supply and because the Lake is a public-recreational area — and, in turn, to preserve and protect the public health. Indeed, in
 
 Bingham v. City of Tuscaloosa,
 
 383 So.2d 542, 544 (Ala.1980), the Alabama Supreme Court, upholding an ordinance requiring a permit to engage in a commercial enterprise or to erect a structure at Lake Tuscaloosa, expressly recognized that the City “is legally vested with authority to establish and maintain safety and health standards with respect both to the public recreational use of the lake and to the primary use of its water for domestic consumption.”
 

 Nonetheless, in support of his argument that the City lacked authority to enact and enforce § 13-51(3), Peak cites cases such as
 
 City of Selma v. Dallas County,
 
 964 So.2d 12 (Ala.2007), and
 
 Town of Mulga v. Town of Maytown,
 
 502 So.2d 731 (Ala.1987), for the proposition that a municipality has no authority to enact or enforce ordinances related to, or in furtherance of, a proprietary function, such as supplying water to its inhabitants.
 

 In
 
 City of Selma,
 
 Dallas County sought to erect a communications tower at the Dallas County courthouse, located within the city limits of Selma. The purpose of the tower was to provide interoperable-communications equipment to Dallas County so that all emergency responders could communicate with each other over existing radio frequencies, part of a plan generated by Congress to enhance homeland security across the country in the wake of the September 11, 2001, terrorist attacks, and furthered by the Alabama Department of Homeland Security and the Dallas County Department of Homeland Security and Emergency Management. The City of Selma sought to enjoin construction of the tower, in part, on the ground that the location of the tower violated two of the City’s zoning ordinances. The trial court granted the County’s motion for a summary judgment, finding that the City’s zoning ordinance was not enforceable against the County, and the City appealed. The Alabama Supreme Court affirmed the judgment, holding that the erection and operation of the communications tower by Dallas County was a governmental function of the County and, therefore, that the City of Selma’s zoning ordinances were not enforceable against the County in its endeavor. In so holding, the Court explained the dichotomy between governmental and proprietary functions as follows:
 

 “ ‘The governmental functions of a municipal corporation include the promotion of the
 
 public peace,
 
 health,
 
 safety,
 
 and morals, as well as the expenditure of money for public improvements, the expense of which ultimately is borne by the property owners.’ 56 Am.Jur.2d
 
 Municipal Corporations
 
 § 183 (2000) (emphasis added). ‘A function is a governmental function if it is the means by which the governing entity exercises the sovereign power for the benefit of all citizens.’
 
 Lane [v. Zoning Bd. of Adjustment of City of Talladega
 
 ], 669 So.2d [958,] 959-60 [ (Ala.Civ.App.1995) ]. It is ‘done by authority of law.... [a]nd ... not ... for profit.... It is not of a proprietary nature, but under the police power to promote the health and well-being of the people.’
 
 Downey v. Jackson,
 
 259 Ala. 189, 193, 65
 
 *15
 
 So.2d 825, 827 (1953). ‘The police powers of a city are among its major governmental functions. Broadly speaking, they extend to all appropriate ordinances for the protection of the peace, safety, health, and good morals of the people affected thereby. The general “welfare” is a generic term often employed in this connection.’
 
 City of Homewood v. Wofford, Oil Co.,
 
 232 Ala. 634, 636, 169 So. 288, 290 (1936).
 

 “ ‘Proprietary ... functions include essentially
 
 commercial
 
 transactions involving the purchase or sale of goods and services and other activities for the
 
 commercial benefit
 
 of a particular government agency. Whereas in its sovereign role, the government carries out unique governmental functions for the benefit of the whole public, in its proprietary capacity the government’s activities are analogous to those of a private concern.’
 

 “Federal Deposit Ins. Corp. v. Harrison,
 
 735 F.2d 408, 411 (11th Cir.1984) (emphasis added).
 

 “Examples of governmental functions in cases challenging the entity’s operating authority include a ‘sanitary landfill garbage disposal’ expressly authorized by statute, operated by a municipality,
 
 [City of Birmingham
 
 v.]
 
 Scogin,
 
 [269 Ala. 679, 688, 115 So.2d 505, 512 (Ala.1959) ]; the operation, expressly authorized by statute, of a baseball diamond by the ‘Park and Recreation Board of the City of Birmingham,’
 
 Downey,
 
 supra; the location, construction, and operation by a county board of education of a facility in which to store, repair, and maintain school property, such as school buses and supplies,
 
 [Lauderdale County Bd. of Educ.
 
 v.]
 
 Alexander,
 
 [269 Ala. 79, 110 So.2d 911 (Ala.1959) ]; the operation, expressly authorized by statute, of a garbage incinerator by the City of Bessemer,
 
 City of Bessemer v. Abbott,
 
 212 Ala. 472, 103 So. 446 (1925); the construction and operation of a jail by the county,
 
 Lane,
 
 supra; the use by a municipality of a building as a warehouse,
 
 Cunningham [v. City of Attalla,
 
 918 So.2d 119 (Ala.Civ.App.2005) ]; and the choice of a location for a new school building by a city board of education,
 
 Alves [v. Board of Educ. for City of Guntersville,
 
 922 So.2d 129 (Ala.Civ.App.2005) ]. Cf.
 
 State ex rel. Hyland v. Baumhauer,
 
 244 Ala. 1, 8, 12 So.2d 326, 330 (1942) (‘A fire department, when organized and functioning, is performing a governmental rather than a proprietary function.’).
 

 “On the other hand, ‘when a city is engaged in the business of supplying for compensation water service to the people, within its lawful power, it is engaged in a
 
 proprietary business.’ [Water Works Bd. of City of Birmingham
 
 v.]
 
 Stephens,
 
 262 Ala. [203,] 209, 78 So.2d [267,] 272 [ (1955) ] (emphasis added). Similarly, the operation of a sewage-disposal plant is, for zoning purposes, a proprietary function.
 
 Jefferson County v. City of Birmingham,
 
 [256 Ala. 436, 55 So.2d 196 (1951) ].”
 

 City of Selma,
 
 964 So.2d at 19-20.
 

 In
 
 Town of Mulga,
 
 the Town of May-town enacted a business-license ordinance imposing an excise tax on all businesses engaged in the manufacture or distribution of gasoline within its corporate limits. The Town of Mulga, which owned and operated a gasoline-distribution system that provided gasoline to customers within the corporate limits of Maytown, refused to purchase a business license and to pay the excise tax under the ordinance. May-town filed a complaint in the circuit court seeking a judgment declaring that Mulga was subject to the ordinance. The trial court entered a judgment in favor of May-
 
 *16
 
 town, and Mulga appealed. The Alabama Supreme Court affirmed the judgment, holding that, in providing gasoline to customers in Maytown, Mulga was engaged in a proprietary, not a governmental, function and, thus, was subject to Maytown’s ordinance just as any other business would be. In doing so, the Court specifically noted:
 

 “ ‘Where a municipality engages in the business of furnishing electricity, lights, water, or gas to the public, it is not then discharging or exercising governmental functions or powers, but is exercising proprietary or business powers, and as to such business it is governed by the same rules of law which are applicable to ordinary business corporations.’ ”
 

 Town of Mulga,
 
 502 So.2d at 734 (quoting
 
 Town of Hackleburg v. Northwest Alabama Gas Dist.,
 
 277 Ala. 355, 359, 170 So.2d 792, 795 (1964)).
 

 Numerous other cases have likewise held that, in furnishing water to its inhabitants, a municipality is engaged in a proprietary, not a governmental, function and, therefore, is subject to the same rules of law applicable to ordinary businesses. See, e.g.,
 
 City of Decatur v. Parham,
 
 268 Ala. 585, 591, 109 So.2d 692, 697 (1959) (“The rule is settled that when a municipality engages in the business of furnishing electricity, lights, water, etc., to the public, it is not then discharging or exercising governmental functions or powers, but is exercising proprietary or business powers and as to such business it is governed by the same rules of law which are applicable to ordinary business corporations....”);
 
 Montgomery v. City of Athens,
 
 229 Ala. 149, 152, 155 So. 551, 553 (1934) (“It is further established in this jurisdiction that a city or town engaging in the business of furnishing electric lights, water, etc., is not in the exercise of governmental powers or functions, but of proprietary or business powers, and it is governed by the same rules of law applicable to persons or ordinary business corporations engaged in a like business.”);
 
 City of Montgomery v. Greene,
 
 180 Ala. 322, 60 So. 900, 903 (1913) (“ ‘A municipal corporation, which supplies its inhabitants with water, does so in the capacity of a private corporation, and not in the exercise of the power of local sovereignty.’ 30 Am. & Eng., Encyc. of Law, 404.”); and
 
 City of Birmingham v. Birmingham Waterworks Co.,
 
 139 Ala. 531, 36 So. 614, 615 (1904) (“It is not denied, as a general proposition, that it is within the power of a municipality to contract for a supply of water, since such a right comes within the business or proprietary powers of the corporation, and is not to be classed as a legislative or governmental power.”).
 

 As illustrated by the cases above, and other cases cited by Peak in his brief, a distinction has historically been made between governmental functions of a municipality and proprietary functions of a municipality. As explained almost a century ago:
 

 “Municipal corporations both possess and exercise two kinds of functions and powers, one governmental and the other proprietary or business. The one is for the purpose of governing the inhabitants of municipalities, and the other for making contracts for the benefit of the municipality and its inhabitants. The one is a part of the sovereign power of the state, delegated by the Legislature. The other is for the most part, though not exclusively nor necessarily, inherent, incidental and implied power.
 
 Bessemer City v. Bessemer Waterworks,
 
 152 Ala. 391, 44 South. 663 [ (1907) ];
 
 Greenville City v. Greenville Waterworks,
 
 125 Ala. 625, 27 South. 764 [ (1900) ];
 
 Weller v. Gadsden,
 
 141 Ala. 642, 37 So. 682, 3 Ann. Cas. 981 [ (1904) ]; 1 Dill. Mun. Corps. §§ 26, 27, 66. In the exercise of
 
 *17
 
 the powers of the one class, municipalities are governed by those sovereign. In the exercise of the other they are controlled by the rules and laws which govern business corporations and individuals in acting and contracting for the benefit of themselves.
 
 Gregsten v. Chicago,
 
 145 Ill. 451, 34 N.E. 426, 36 Am. St. Rep. 496 [ (1893) ];
 
 Illinois Trust & Savings [Bank
 
 ]
 
 v. City of Arkansas City,
 
 76 F. 282, 22 C.C.A. 171, 34 L.R.A. 518 [ (1896) ]. In the exercise of governmental powers and functions, a municipal corporation is bound, prohibited, and inhibited by the same constitutional provisions or Bill of Rights that the state or Legislature is bound by, because to this extent and purpose it is a part of the state. But in the exercise of its proprietary and business powers, and in the discharge of such functions, it is bound, prohibited, inhibited, authorized, and restrained by the same constitutional and statutory provisions which apply to other business corporations and individuals in the conduct of their private affairs.”
 

 Town of New Decatur v. American Tel. & Tel. Co.,
 
 176 Ala. 492, 529-30, 58 So. 613, 624-25 (1912) (Mayfield, J., dissenting).
 

 “A municipal corporation in the pursuit of its proprietary functions is not, however, equivalent to a private corporation in all respects. A municipal corporation is permitted to enter the commercial field solely to promote the welfare of its constituents, and ‘is no less a government because it owns and operates its own water system.’ ”
 

 O’Fallon Dev. Co. v. City of O’Fallon,
 
 43 Ill.App.3d 348, 353, 2 Ill.Dec. 6, 356 N.E.2d 1293, 1298 (1976) (quoting
 
 City of Chicago v. Tribune Co.,
 
 307 Ill. 595, 608, 139 N.E. 86, 90 (1923)). “A proprietary function or power of a city operated for the public is none the less a public function though for some purposes it may not be strictly a governmental function.”
 
 City of Bessemer v. Personnel Bd. for Jefferson County,
 
 240 Ala. 411, 413, 199 So. 815, 816 (1941).
 

 To be sure, as Peak points out in his brief, the governmental/proprietary dichotomy has been used to hold that zoning ordinances do not apply to a governmental entity, such as a county or a municipality, engaged in a governmental function as opposed to a proprietary function, see
 
 City of Selma,
 
 supra, and the cases cited therein, and has been used to hold that one municipality may tax a second municipality when the second municipality is engaged in a proprietary function as opposed to a governmental function, see
 
 Town of Mulga,
 
 supra. In addition, in the past, the governmental/proprietary dichotomy has provided immunity from tort liability to municipalities engaged in governmental functions but not to municipalities engaged in proprietary functions, see
 
 City of Selma,
 
 supra (noting the abolishment of the governmental/proprietary-function dichotomy for determining tort liability of municipalities). However, the governmental/proprietary dichotomy has never been held to strip a municipality of the authority to enact ordinances to protect the public health, even when those ordinances relate to, or are in furtherance of, a proprietary function. See, e.g.,
 
 St. Clair County Home Builders Ass’n v. City of Pell City,
 
 61 So.3d 992 (Ala.2010), and
 
 Benson v. City of Andalusia,
 
 240 Ala. 99, 195 So. 443 (1940) (both upholding municipal ordinances relating to water and/or sewer systems owned and operated by municipalities).
 

 Although we agree with Peak that, in providing water to its residents, the City is engaging in a proprietary function, in enacting § 13-51(3), and any other ordinance, the City is engaging in a governmental function by virtue of its police powers. See, e.g.,
 
 Mitchell v. City of Mobile,
 
 
 *18
 
 244 Ala. 442, 445, 13 So.2d 664, 667 (1943) (“While in the ownership and operation of a utility, the city is engaged in a proprietary enterprise; in prescribing lawful rates, the governing body acts in a legislative capacity. In both capacities, the governing body is the chosen agency of the people of the city and subject to their control through democratic processes.”). As the Idaho Supreme Court aptly explained:
 

 “ ‘There is no inconsistency between the holding herein that in the operation of a public utility the village exercises a proprietary function, and the holding that in requiring connections to be made with the sewage system the village is exercising its police power, which is a governmental function. The fact that an ordinance, providing for the establishment and operation of a municipal water and sewage system, may also contain regulations within the police power, is not conflicting, inconsistent, or an improper com[m]ingling of the two recognized functions of a municipality. The one is regarded as complimentary of the other. If the water and sewage system were privately owned and operated, unquestionably the municipality could by ordinance regulate the operation in the interest of public health, and, in so doing, require residents to connect with and use the system.’ ”
 

 Loomis v. City of Hailey,
 
 119 Idaho 434, 437, 807 P.2d 1272, 1275 (1991) (quoting
 
 Schmidt v. Village of Kimberly,
 
 74 Idaho 48, 63, 256 P.2d 515, 524 (1953)). See also
 
 Rupp v. Grantsville City,
 
 610 P.2d 338, 341 n. 6 (Utah 1980) (“[W]hile fulfilling a proprietary role in operating the waterworks the municipality is also employing its governmental powers to mandate connection with the new sewer system.”).
 

 Here, in enacting § 13-51(3), the City was engaging in a governmental function within its statutory police powers, and not in a proprietary function. Therefore, the City had the authority, pursuant to the statutory provisions cited above, to enact and enforce § 13-51(3), and Peak’s argument to the contrary is meritless.
 

 II.
 

 Peak also contends that § 13-51(3) is invalid because, he says, it is preempted by state law. Specifically, Peak argues that the legislature indicated an intent to preempt the entire field of wastewater regulation by providing a comprehensive scheme for the regulation of septic tanks by both the Alabama Onsite Wastewater Board, see § 34-21A-1 et seq., Ala.Code 1975, and the administrative regulations promulgated by that board, and by the State Board of Health, see § 22-26-1 et seq., Ala.Code 1975, and the administrative regulations promulgated by that board, and that § 13-51 is in direct conflict with that regulatory scheme.
 

 Article IV, § 89, Alabama Constitution of 1901, provides that “[t]he legislature shall not have power to authorize any municipal corporation to pass any laws inconsistent with the general laws of this state.” As noted above, § 11-45-1, Ala. Code 1975, provides that “[m]unieipal corporations may from time to time adopt ordinances and resolutions
 
 not inconsistent with the laws of the state.”
 
 Simply put, “[a] municipality ... is expressly prohibited under Alabama law from adopting any ordinance that is inconsistent with the laws of this State.”
 
 Alabama Disposal Solutions-Landfill, L.L.C. v. Town of Lowndesboro,
 
 837 So.2d 292, 301 (Ala.Civ.App.2002). As explained by the Alabama Supreme Court in
 
 Alabama Recycling Ass’n, Inc. v. City of Montgomery,
 
 24 So.3d 1085 (Ala.2009):
 

 “ ‘ “ ‘Whether an ordinance is inconsistent with the general law of the State is
 
 *19
 
 to be determined by whether the municipal law prohibits anything which the State law specifically permits.””
 
 Gibson v. City of Alexander City,
 
 779 So.2d 1158, 1155 (Ala.2000) (quoting
 
 Lanier v. City of Newton,
 
 518 So.2d 40, 43 (Ala.1987), quoting in turn
 
 Congo v. State,
 
 409 So.2d 475, 478 (Ala.Crim.App.1981)). In
 
 Lanier v. City of Newton,
 
 this Court addressed ‘inconsistency5 with regard to a conflict between a statute and an ordinance, stating: ‘ “Inconsistent” is defined by Black’s Law Dictionary (5th ed.1979) as “mutually repugnant or contradictory; contrary, the one to the other, so that both cannot stand, but the acceptance or establishment of the one implies the abrogation or abandonment of the other.” It implies “contradiction — qualities which cannot coexist— not merely a lack of uniformity in details.”
 
 City of Montgomery v. Barefield,
 
 1 Ala.App. 515, 528, 56 So. 260, 262 (1911). 518 So.2d at 43.”
 

 24 So.3d at 1088-89.
 
 [5]
 
 “An
 
 ordinance which merely enlarges upon the provision of a statute by requiring more restrictions than the statute requires creates no conflict
 
 unless the statute limits the requirement for all cases to its own terms.”
 
 Congo v. State,
 
 409 So.2d 475, 478 (Ala.Crim.App.1981) (emphasis added). “Mere differences in detail do not create a conflict, and we cannot say a conflict exists merely because the Act is silent where the ordinance speaks.”
 
 Alabama Recycling,
 
 24 So.3d at 1090. Likewise, “it is no objection to a municipal ordinance not in contravention of a state law that it affords additional regulation ‘complementary to the end state legislation would effect.' "
 
 Standard Chem. & Oil Co. v. City of Troy,
 
 201 Ala. 89, 92, 77 So. 383, 386 (1917) (citing
 
 Turner v. Town of Lineville,
 
 2 Ala.App. 454, 56 So. 603, 605 (1911)). Moreover, “‘[t]o preempt an entire field, “an act must make manifest a legislative intent that no other enactment may touch upon the subject in
 
 *20
 
 any way.” ’ ”
 
 Gann v. City of Gulf Shores,
 
 29 So.3d 244, 251 (Ala.Crim.App.2009) (quoting
 
 Foothills Brewing Concern, Inc. v. City of Greenville,
 
 377 S.C. 355, 361, 660 S.E.2d 264, 267 (2008) (quoting in turn
 
 Bugsy’s, Inc. v. City of Myrtle Beach,
 
 340 S.C. 87, 94, 530 S.E.2d 890, 893 (2000))). “[Ejxtensive regulation in a certain field is not enough.”
 
 Hensler v. City of Davenport,
 
 790 N.W.2d 569, 585-86 (Iowa 2010). Rather, ‘“there must be some clear expression of legislative intent to preempt a field from regulation by local authorities, or a statement of the legislature’s desire to have uniform regulations statewide.’ ” 790 N.W.2d at 586 (quoting
 
 City of Davenport v. Seymour,
 
 755 N.W.2d 533, 539 (Iowa 2008)).
 

 Here, we find no conflict between state law and § 13-51(3) and no preemption of the field of septic tank regulation. Nothing in any of the statutes or administrative regulations cited by Peak expressly permit what § 13-51(3) prohibits, i.e., not registering with the City a septic tank located in the drainage basin of Lake Tuscaloosa, nor do we find anything in those statutes and administrative regulations showing a clear expression of legislative intent to preempt the entire field of wastewater regulation. Rather, it is evident, upon examination of the relevant statutes and administrative regulations, that § 13-51(3) simply enlarges on the regulation of septic tanks by the state and is complementary thereto.
 

 Section 34-21A-1, Ala.Code 1975, provides:
 

 “The Alabama Onsite Wastewater Board is created
 
 to examine, license, and regulate persons engaged in the manufacture, installation, or servicing of onsite sewage systems
 
 in Alabama. As more residences are built in rural areas where public sewer hookups and centralized sewage treatment systems are often unavailable, many property owners must rely on onsite sewage systems, such as septic systems, to handle residential waste and sewage. The improper manufacture, installation, service, cleaning, and maintenance of onsite sewage equipment and treatment systems can contaminate and pollute the environment and pose significant harm to public health and the rural environment. This board is created
 
 to establish the qualification levels for those engaged in the manufacture, installation, servicing, or cleaning of onsite sewage systems
 
 and equipment in Alabama and promote the proper manufacture, installation, and servicing of onsite sewage systems.”
 

 (Emphasis added.) The duties of the On-site Wastewater Board include the licensing of those engaged in the manufacture, installation, or servicing of septic tanks, §§ 34-21A-7, -12, and -13 Ala.Code 1975; the establishment of eligibility requirements, such as training and examinations, for such licensure, §§ 34-21A-7, -14, and -15, Ala.Code 1975; the establishment of procedures to investigate and resolve complaints against licensees, § 34-21A-22, Ala.Code 1975; and the establishment of criteria for the suspension or revocation of such licenses, § 34-21A-21. The Onsite Wastewater Board is also given the authority to promulgate administrative regulations in furtherance of its duties, § 34-21A-9, Ala.Code 1975. Those regulations are found in Ala. Admin. Code r. 628-X-l et seq. (2010).
 

 The clearly stated purpose of the Onsite Wastewater Board is to regulate those persons who manufacture, install, and service septic tanks, not those persons who own or operate septic tanks on their property, such as Peak. Indeed, § 34-21A-10, Ala.Code 1975, specifically excludes property owners from the licensing regulations of the Onsite Wastewater Board:
 

 
 *21
 
 “The licensing requirements of this chapter
 
 shall not apply to owners of property for the purpose of installing, cleaning, servicing, or maintaining an onsite sewage system on their own property
 
 with a one-family or two-family residence used as their primary residence so long as the owners of the property with an onsite sewage system complete all installation, cleaning, servicing, or maintenance themselves, without help, at their primary residence.”
 

 (Emphasis added.) Thus, § 13-51(8) is clearly not in conflict with or preempted by § 34-21A-1 et seq. or the corresponding administrative regulations in Ala. Admin. Code (Onsite Wastewater) r. 628-X-l et seq. (2010).
 

 Section 22-26-1 et seq., Ala.Code 1975, deals with sewage collection, treatment, and disposal facilities. Section 22-26-1, Ala.Code 1975, provides:
 

 “It shall be unlawful and shall constitute a misdemeanor to build, maintain or use an insanitary sewage collection, treatment and disposal facility or one that is or is likely to become a menace to the public health anywhere within the state, including plumbing facilities, privies, septic tank systems, other private collection and disposal systems, sewer lines, public or private, municipal, community, subdivision or other treatment plant and disposal units, but excluding plumbing within structures located within the police jurisdiction of municipal corporations and regulated by the municipal corporation.”
 

 Section 22-26^4, Ala.Code 1975, further provides that “[t]he issuance of permits for the installation of plumbing within structures located within the police jurisdiction of municipal corporations, and the inspection and approval of same, shall be functions of municipal corporations.” Section 22-26-2, Ala.Code 1975, also provides, in relevant part, that the State Board of Health
 

 “shall require every person ... owning or occupying property within the state, to install the required plumbing facilities, type and number of sewage collection, treatment and disposal facilities conforming to rules and regulations of the State Board of Health and/or county boards of health and require connection to a sanitary sewer conforming to rules and regulations of the State Board of Health and/or county boards of health where sanitary sewers are available and are not regulated by the municipal corporation, or to dispose of sewage in such sanitary manner as shall be approved by the State Board of Health. All required sewage treatment and disposal facilities shall conform in every respect with the specifications, rules and regulations applying to these facilities made, adopted and promulgated by the State Board of Health and/or county boards of health and shall be maintained as prescribed by the said rules and regulations.”
 

 Further,
 

 “All plans and specifications applying to sewage collection, treatment and disposal shall be first submitted to the State Board of Health and/or county boards of health for approval before construction ... [and] said plans and specifications shall be approved if in conformance with said specifications, rules and regulations and the required permits for construction issued by the State Board of Health_ No person, firm, corporation or municipal corporation shall begin construction without said approval, and a violation of this section shall constitute a misdemeanor, punishable, on conviction, by a fine of not to exceed $500.00.”
 

 § 22-26-8, Ala.Code 1975.
 

 In furtherance of its duties, the State Board of Health promulgated extensive
 
 *22
 
 regulations regarding “onsite sewage disposal.” See Ala. Admin. Code (Department of Public Health) r. 420-3-1 et seq. (2010). Those regulations include such things as requiring property owners to obtain permits before installing or repairing septic tanks, see Ala. Admin. Code r. 420-3-1-.08; setting limitations on the type of properties on which septic tanks can be installed, see Ala. Admin. Code r. 420-3-1-.09, and Ala. Admin. Code r. 420-3-1-.71 through
 
 .86;
 
 setting design and technical specifications for septic tanks, see Ala. Admin. Code r. 420-3-1-.47 through .51; and recommending servicing intervals, see Ala. Admin. Code r. 420-3-l-.05(2). Moreover, as the City points out in its brief, Ala. Admin. Code r. 420-3-1-.104, provides:
 

 “(1)
 
 Approval of a
 
 lot, subdivision, building development or
 
 method of sewage disposal by the Board or its agent does not constitute or imply approval by a municipality,
 
 county or other entity
 
 having
 
 planning, zoning or
 
 other legal jurisdiction.
 
 Similarly, approval of a like plan by another entity does not negate the requirement for approval of an OSS [onsite sewage treatment and disposal system] by the Board or its agent.
 

 “(a) LHDs [local health departments] may regulate
 
 according to another jurisdiction’s more stringent requirements,
 
 provided that a properly executed memorandum of understanding is forwarded through the environmental chain of command for review by the Department’s Office of General Counsel and is approved by the State Health Officer.
 

 “(b) LHDs may also
 
 cooperate with other jurisdictions in dealing with common areas of regulation that are subject to a coordinated effort,
 
 such as the existence of zoning requirements. This should be by a memorandum of understanding, forwarded through the environmental chain for legal review and approval by the State Health Officer.”
 

 (Emphasis added.)
 

 Peak maintains that by specifically carving out in § 22-26-1 et seq., Ala.Code 1975, “plumbing within structures located within the police jurisdiction of municipal corporations” to be regulated by municipalities, the legislature evidenced an intent to preempt the entire field of septic-tank regulation and to limit a municipality’s authority to regulating only “plumbing within facilities,” and that § 13-51(3) is, thus, in conflict with that limited authority. He also argues that the extensive regulation of septic tanks by the State Board of Health’s administrative regulations clearly express an intent on the part of the State to create a statewide uniform regulatory scheme for septic tanks, thereby preempting the entire field of wastewater regulation, and that the language in Ala. Admin. Code r. 420-3-1-.104 referencing “more stringent requirements” of other jurisdictions refers only to local jurisdiction requirements “in areas not otherwise regulated by local departments of health.” (Peak’s reply brief, at p. 14.)
 

 We find Peak’s interpretation of § 22-26-1 et seq., Ala.Code 1975, and Ala. Admin. Code r. 420-3-1 et seq. to be strained, at best.
 

 “ ‘In determining legislative intent, statutes are, where possible, construed in harmony with statutes existing at the time of enactment, so that each is afforded a field of operation.’
 
 Sullivan v. State ex rel. Attorney General of Alabama,
 
 472 So.2d 970, 973 (Ala.1985). ‘It is a fundamental principle of statutory construction that in enacting the statute the legislature had full knowledge and information as to prior and existing law
 
 *23
 
 and legislation on the subject of the statute.’
 
 Miller v. State,
 
 349 So.2d 129, 131 (Ala.Cr.App.1977). ‘[I]n cases of conflicting statutes on the same subject, the latest expression of the legislature is the law. Where a conflict exists between statutes, the last enactment must take precedence.’
 
 [Baldwin County
 
 v.]
 
 Jenkins,
 
 494 So.2d [584,] 588 [ (Ala.1986) ] (citations omitted).”
 

 Hatcher v. State,
 
 547 So.2d 905, 906-07 (Ala.Crim.App.1989). At the time § 22-26-1 et seq., Ala.Code 1975, was originally enacted in 1969, § 11-50-55, Ala.Code 1975 — which, as noted above, specifically gives municipalities the authority to regulate septic tanks — was already in effect. Thus, we must presume that the legislature was aware of the existence of § 11-50-55, Ala.Code 1975, and we must construe § 22-26-1, et seq., Ala.Code 1975, as well as the administrative regulations promulgated pursuant to the authority provided therein, in harmony with § 11-50-55. In doing so, we find no conflict between the authority given to municipalities in § 11-50-55 to regulate septic tanks and the authority given to municipalities in § 22-26-1 et seq. to regulate “plumbing within structures.”
 

 Section 22-26-1 does nothing more than make it a crime against the state to own or operate an unsanitary septic tank, while leaving to municipalities the discretion to determine whether it would be a crime against the municipality to own or operate unsanitary plumbing within structures located within the municipality’s police jurisdiction. Section 22-26-1 does not speak to the registration of septic tanks, but speaks only to the ownership or operation of unsanitary septic tanks. Section 22-26-1 is a criminal statute, not a regulatory statute, and it cannot be construed, as Peak urges this Court to do, as evidence of legislative intent to preempt the field of wastewater regulation. In addition, § 22-26-4 does nothing more than expressly give municipalities the authority to regulate plumbing within structures located within the municipality’s police jurisdiction. Nothing in § 22-26-4 speaks to septic tanks at all, much less indicates an intent on the part of the legislature to usurp the statutory power of municipalities to regulate septic tanks under § 11-50-55.
 

 Likewise, nothing in the language of Ala. Admin. Code r. 420-3-1-.104 indicates that it is limited in scope solely to those areas not regulated by the State Board of Health, as Peak argues. Rather, the language is clear that mere approval of a septic tank by the State Board of Health “does not constitute or imply approval by a municipality ... having ... legal jurisdiction” and that local county boards of health may regulate “according to another jurisdiction’s more stringent requirements” and may “cooperate with other jurisdictions in dealing with common areas of regulation that are subject to a coordinated effort.” The City here, as explained in Part I of this opinion, has the statutory authority to regulate septic tanks, i.e., it has legal jurisdiction. In addition, ordinance no. 6619, by which § 13-51 was originally enacted reflects that it was the local county board of health that proposed the plan to the City to address pollution in Lake Tuscaloosa; that provided the report indicating that leaking septic tanks were a source of such pollution; and that provided the City with the information on the septic tanks in the drainage basin, based on the permits that it had issued, that allowed the City to send reminder notices to those property owners subject to the registration requirements in § 13-51(3). This shows that the local department of health was cooperating with the City in a coordinated effort to regulate septic tanks in the drainage basin.
 

 Although certainly the State Board of Health has provided extensive regulation
 
 *24
 
 of septic tanks, as noted above, extensive regulation is not sufficient to establish that the State intended to preempt an entire field. After thoroughly reviewing § 22-26-1 et seq., Ala.Code 1975. and Ala. Admin. Code r. 420-8-1 et seq., we find no clear expression of legislative intent to preempt the entire field of wastewater regulation. We also find nothing in § 22-26-1 et seq. or Ala. Admin. Code r. 420-3-1 et seq. that even addresses registration of septic tanks, much less usurps the clear statutory authority of a municipality under § 11-50-55 to regulate septic tanks. Rather than being in conflict with any state law, § 13-51(3) is actually complementary to that law.
 

 For the reasons stated above, we find no inconsistency between the registration requirement in § 13-51(3) and state law and no preemption by the State of the entire field of wastewater regulation. Therefore, Peak is entitled to no relief on this claim.
 

 III.
 

 Peak also contends that § 13-51(3) violates his rights to due process and equal protection under both the United States and Alabama Constitutions because, he says, the provision is unreasonable and arbitrary and is not rationally related to a legitimate state interest. Peak appears to concede in his brief that protecting Lake Tuscaloosa from contaminants is a legitimate governmental interest, and we agree. Protecting the water supply and protecting a recreational area are both clearly legitimate interests of government, both state and local. However, Peak asserts that because there is no evidence that leaking septic tanks are actually contaminating the lake, but are only a potential threat, and because the City has not addressed other sources of contamination to the lake, § 13-51 cannot be rationally related to protecting the lake.
 
 [6]
 
 We disagree.
 

 In
 
 Northington v. Alabama Department of Conservation & Natural Resources,
 
 33 So.3d 560 (Ala.2009), the Alabama Supreme Court explained:
 

 “In
 
 McInnish v. Riley,
 
 925 So.2d 174, 178 (Ala.2005), this Court further stated:
 

 “ ‘[T]he standard of review of the trial court’s judgment as to the constitutionality of legislation is well established. This Court “ ‘should be very reluctant to hold any act unconstitutional.’”
 
 Ex parte D.W.,
 
 835 So.2d 186, 189 (Ala.2002) (quoting
 
 Ex parte Boyd,
 
 796 So.2d 1092, 1094 (Ala.2001)). “ [I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every
 
 presumption and in-tendment in favor of its validity,
 
 and seek to sustain rather than strike down the enactment of a coordinate branch of the government.”
 
 Alabama State Fed’n of Labor v. McAdory,
 
 246 Ala. 1, 9, 18 So.2d 810, 815 (1944) (emphasis added [in
 
 Mclnnish
 
 ]). This is so, because “it is the recognized duty of the court to sustain the act unless it is
 
 clear beyond reasonable doubt that it is violative of the fundamental law.”
 
 246 Ala. at 9, 18 So.2d at 815 (emphasis added [in
 
 Mclnnish
 
 ]).’
 

 “Moreover, the rational-basis test is the proper test to apply to either a substantive-due-process challenge or an equal-protection challenge when neither
 
 *25
 
 a suspect class nor a fundamental right is involved.
 
 Gideon v. Alabama State Ethics Comm’n,
 
 379 So.2d 570 (Ala.1980). ‘Under the rational basis test the Court asks: (a) Whether the classification furthers a proper governmental purpose, and (b) whether the classification is rationally related to that purpose.’ 379 So.2d at 574.”
 

 33 So.3d at 564. Here, neither a suspect class nor a fundamental right is involved. Therefore:
 

 “ ‘The Due Process Clause is satisfied so long as the law bears a reasonable relation to a proper legislative purpose and is neither arbitrary nor discriminatory.
 
 Fowler v. State,
 
 440 So.2d 1195 (Ala.Cr.App.1983).
 
 Williams v. State,
 
 710 So.2d 1276, 1309 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). Furthermore,
 

 “ ‘ “ ‘[t]he Equal Protection Clause of the Fourteenth Amendment goes no further than to prohibit invidious discrimination.... If there is some reasonable basis for the recognition of separate classes, and if the disparate treatment of the classes has a rational relation to the object sought to be achieved by lawmakers, the Constitution is not offended_’ ”
 

 “
 
 ‘Goodson v. State,
 
 588 So.2d 509, 514 (Ala.Cr.App.1991) (quoting
 
 State v. Thompson,
 
 133 N.J.Super. 180, 336 A.2d 11, 14 (1975)).’
 

 “May v. State,
 
 710 So.2d 1362, 1365 (Ala.Cr.App.1997).”
 

 City of Montgomery v. Norman,
 
 816 So.2d 72, 79 (Ala.Crim.App.1999).
 

 “The law is clear that a party attacking the constitutionality of a statute has the burden of negating every conceivable or reasonable basis that might support the constitutionality of the statute.
 
 Thorn v. Jefferson County,
 
 375 So.2d 780 (Ala.1979). Moreover, this Court will uphold a statute as long as the statute implements
 
 any rational purpose. State v. Colonial Pipeline Co.,
 
 471 So.2d 408 (Ala.Civ.App.1984). ‘[A] statutory discrimination will not be set aside if
 
 any set of facts reasonably may be conceived to justify it.’
 
 471 So.2d at 412. ‘Unless clearly and patently arbitrary, oppressive and capricious on its face, such classification is not subject to judicial review. Mere inequality under such classification is not sufficient to invalidate a statute.’
 
 State v. Spann,
 
 270 Ala. 396, 400, 118 So.2d 740, 743 (1959).”
 

 Northington,
 
 33 So.3d at 564. Thus, “[t]he fundamental inquiry in a rational-basis analysis ‘is concerned with the
 
 existence
 
 of a conceivably rational basis, not whether that basis was actually considered by the legislative body.’ ” 33 So.3d at 566 (quoting
 
 Haves v. City of Miami,
 
 52 F.3d 918, 922 (11th Cir.1995)).
 

 “The validity of a police power regulation, therefore, primarily depends on whether, under all the existing circumstances, the regulation is reasonable, and whether it is really designed to accomplish a purpose properly falling within the scope of the police power.
 
 Crabtree v. City of Birmingham,
 
 292 Ala. 684, 299 So.2d 282 (1974). Cities may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities.
 
 Leary v. Adams,
 
 226 Ala. 472, 147 So. 391 (1933). Otherwise expressed, the police power may not be employed to prevent evils of a remote or highly problematical character. Nor may its exercise be justified when the restraint imposed upon the exercise of a private right is disproportionate to the
 
 *26
 
 amount of evil that will be corrected.
 
 Bolin v. State,
 
 266 Ala. 256, 96 So.2d 582, conformed to in 89 Ala.App. 161, 96 So.2d 592 (1957).”
 

 City of Russellville v. Vulcan Materials, Co.,
 
 382 So.2d 525, 527 (Ala.1980).
 

 “ ‘The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary.’
 
 Members of City Council v. Taxpayers for Vincent,
 
 466 U.S. 789, 805, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984). While the right of the municipality to enact local ordinances is not unlimited, the ordinance must bear substantial relation to the public health, safety, morals, general welfare, and general convenience of its residents. If the ordinance is debatable, this Court will not substitute its judgment for that of the municipal government body acting in a legislative capacity. See
 
 City of Russellville v. Vulcan Materials Co.,
 
 882 So.2d 525 (Ala.1980).”
 

 Walter v. City of Gulf Shores,
 
 829 So.2d 181, 186 (Ala.Crim.App.2001), aff'd, 829 So.2d 186 (Ala.2002).
 

 We reject Peak’s argument that § 13-51(3) cannot be rationally related to protecting Lake Tuscaloosa because there is no evidence that leaking septic tanks are actually contaminating the lake, but only the possibility that a leaking septic tank could contaminate the lake. Contrary to Peak’s assertion, “a legislative choice is. not subject to court-room fact-finding and may be based on rational speculation unsupported by evidence or empirical data.”
 
 F.C.C. v. Beach Commc’ns, Inc.,
 
 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Moreover, as noted above, ordinance no. 6619, by which § 13-51 was originally enacted, specifically states that the county health department presented a report to the City stating that ongoing monitoring of the water quality of Lake Tuscaloosa indicated higher than normal bacteria in the lake and specifically recognizing leaking septic tanks as one of several sources of the pollution.
 
 [7]
 
 In addition, Peak’s reliance on a report, submitted by Peak to the trial court as an exhibit, prepared by the Geological Survey of Alabama at the request of the City in 2004 (after the City had already enacted § 13— 51(3)), for the proposition that septic tanks are not, in fact, a danger to the lake, is misplaced. As the City correctly argued, a thorough reading of this report actually shows that it, like the report from the county health department, indicates that leaking septic tanks are a source of pollution to the lake.
 
 [8]
 

 
 *27
 
 We also reject Peak’s argument that the City’s failure to pursue regulations of any other sources of contamination of Lake Tuscaloosa indicates that the City’s claim that § 13-51(3) was enacted to protect Lake Tuscaloosa is false and that, therefore, § 13-51(3) is not rationally related to protecting the lake. “A Legislature may hit at an abuse which it has found, even though it has failed to strike at another.”
 
 United States v. Carotene Products, Co.,
 
 304 U.S. 144, 151, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). “[T]here is no constitutional requirement ... that the Legislature must be held rigidly to the choice of regulating all or none.”
 
 Silver v. Silver,
 
 280 U.S. 117, 123, 50 S.Ct. 57, 74 L.Ed. 221 (1929). “Legislatures may implement their program step by step ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.”
 
 City of New Orleans v. Dukes,
 
 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). As the Alabama Supreme Court explained in
 
 Tyson v. Johns-Manville Sales, Corp.,
 
 399 So.2d 263 (Ala.1981):
 

 “The Supreme Court has made it clear that the legislature need not ‘strike at all evils at the same time or in the same way,’
 
 Minnesota v. Clover Leaf Creamery Co.,
 
 [449 U.S. 456, 466,] 101 S.Ct. [715,] 725 [(1981) ], citing
 
 Semler v. Oregon State Board of Dental Examiners,
 
 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935). It is legitimate for the legislature to proceed ‘one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.’
 
 Williamson v. Lee Optical,
 
 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955)”
 

 399 So.2d at 272. See also
 
 Dandridge v. Williams,
 
 397 U.S. 471, 486-87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (“[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all.... It is enough that the State’s action be rationally based and free from invidious discrimination.”).
 

 Section 13-51(3) is rationally related to a legitimate governmental interest. As noted above, § 13-51 was enacted based on a report from the county health department indicating that leaking and/or poorly maintained septic tanks within the drainage basin of Lake Tuscaloosa are one source of the high bacteria levels in the lake. A subsequent report by the Geological Survey of Alabama also indicates that leaking and/or poorly maintained septic tanks within the drainage basin are a source of contamination. In addition, common sense dictates that a leaking and/or poorly maintained septic tank within the drainage basin, i.e., that part of the land around the lake in a bowl shape that slopes toward the lake, could contaminate the lake because the bacteria from the septic tank would travel toward the lake, while a leaking and/or poorly maintained septic tank outside the drainage basin where the land does not slope toward the lake would not pose a risk to the lake because the bacteria from the septic tank would not travel toward the lake. The registration requirement in § 13-51(3) allows the City to keep track of the septic tanks within its police
 
 *28
 
 jurisdiction that are located within the drainage basin of the lake that could potentially pollute the lake and aids the City in enforcing the other requirements in § 13-51. Knowledge of the location of the septic tanks within the drainage basin will: (1) aid the City, as it continues to monitor the bacteria levels in the lake, in gaining additional knowledge regarding the cause and degree of contamination of the lake so that it may then pursue additional avenues to protect the lake from pollution; and (2) aid the City in limiting, as best it can, the pollution to the lake in order to protect the water supply as well as to protect the lake as a recreational resource. Therefore, the registration requirement is rationally related to protecting Lake Tuscaloosa from contaminants and does not violate principles of due process or equal protection.
 

 We note that Peak also argues that he should have been granted an evi-dentiary hearing on his equal-protection and due-process claims
 
 [9]
 
 so that he could present evidence proving that § 13-51(8) is not rationally related to protecting Lake Tuscaloosa. Specifically, he argues that he should have been allowed the opportunity “to present evidence that septic tanks are not a source of pollution of the [l]ake[ ], and that other significant sources of pollution to the [l]ake[ ] are ignored by the City[.]” (Peak’s brief, at p. 62.) However, as explained above, scientific evidence is not required for a legislative choice to be rationally related to a legitimate governmental interest, and a legislative body is not constitutionally required to address all evils at the same time or in the same way. Thus, the evidence Peak wanted to present would not have been relevant to the determination of Peak’s due-process and equal-protection claims regarding § 13-51(3). Although we recognize that the burden here was on Peak to establish the invalidity of § 13-51(3), see, e.g.,
 
 Jefferson County v. Richards,
 
 805 So.2d 690, 706 (Ala.2001) (“[T]he burden is on the one challenging the ordinance to clearly show its invalidity.”), this burden does not necessarily rest on evidentiary proof. As the Wisconsin Court of Appeals recognized: “This ‘heavy burden’ does not refer to evidentiary proof; in this context, it means that we give deference to the legislature, and our degree of certainty regarding unconstitutionality results from the persuasive force of the legal argument.”
 
 State v. Lynch,
 
 297 Wis.2d 51, 60, 724 N.W.2d 656, 660 (Wis.Ct.App.2006). Peak’s due-process and equal-protection arguments here are challenges to the facial validity of § 13-51(3), not to the validity of § 13-51(3) as applied only to him. See, e.g.,
 
 State v. Adams,
 
 [Ms. CR-08-1728, November 5, 2010] — So.3d-(Ala.Crim.App. 2010) (explaining the difference between an “as applied” constitutional challenge to a statute, which is based on the facts of a particular case, and a “facial” constitutional challenge to a statute, which is based on whether the statute is always unconstitutional, regardless of the particular facts). Therefore, no evidentiary hearing was necessary. See, e.g.,
 
 In re Jenkins,
 
 50 Cal.4th 1167, 1181, 116 Cal.Rptr.3d 790, 240 P.3d 260, 270 (2010) (no evidentiary hearing is required on due-process challenge to statute under rational-basis analysis because “[w]hether a statute or regulation is rational is, as a general rule, a legal question for the court to resolve, not a factual question requiring an evidentiary hearing”); and
 
 People v. Johnson,
 
 195 Colo. 350, 352, 578 P.2d 226, 227-28 (1978) (no evidentiary hearing is required on equal-protection challenge to statute where “motion did not assert that any particular facts rendered the statute unconstitutional as applied to the appellant” and “only
 
 *29
 
 questions of law were presented to the trial court”).
 

 IV.
 

 Finally, Peak contends that § 13-51(3) violates his Fifth Amendment privilege against self-incrimination because, he says, it requires that he admit that he owns property in the drainage basin of Lake Tuscaloosa within the police jurisdiction of the City and that he has a septic tank on his property, two of the three elements the City would be required to prove if, at some point in the future, it prosecuted him for failing to maintain his septic tank in accordance with § 13-51(6). This argument is clearly meritless.
 

 As the trial court noted in its order,
 
 California v. Byers,
 
 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), is instructive here. In
 
 Byers,
 
 the defendant was charged with violating California’s “hit and run” statute, which required the driver of a motor vehicle involved in an accident to stop at the scene and provide his or her name and address. In upholding the statute against the defendant’s challenge that it violated his privilege against self-incrimination, a plurality of the United States Supreme Court explained:
 

 “Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State’s demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.
 

 “An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion.
 

 “In each of these situations there is some possibility of prosecution — often a very real one — for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be ‘a link in the chain’ of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.
 

 “United States v. Sullivan,
 
 274 U.S. 259 (1927), shows that an application of the privilege to the California statute is not warranted. There a bootlegger was prosecuted for failure to file an income tax return. He claimed that the privilege against compulsory self-incrimination afforded him a complete defense because filing a return would have tended to incriminate him by revealing the unlawful source of his income. Speaking for the Court, Mr. Justice Holmes rejected this claim on the ground that it amounted to ‘an extreme if not an extravagant application of the Fifth Amendment.’
 
 Id.,
 
 at 263-264.... Sullivan’s tax return, of course, increased his risk of prosecution and conviction for violation of the National Prohibition Act.
 
 *30
 
 But the Court had no difficulty in concluding that an extension of the privilege to cover that kind of mandatory report would have been unjustified.
 
 In order to invoke the privilege it is necessary to show that the compelled, disclosures will themselves confront the claimant with ‘substantial hazards of self-incrimination.’
 

 “The components of this requirement were articulated in
 
 Albertson v. SACB,
 
 382 U.S. 70 (1965), and later in
 
 Marchetti v. United States,
 
 390 U.S. 39 (1968),
 
 Grosso v. United States,
 
 390 U.S. 62 (1968), and
 
 Haynes v. United States,
 
 390 U.S. 85 (1968).
 
 [10]
 
 In
 
 Albertson
 
 the Court held that an order requiring registration by individual members of a Communist organization violated the privilege. There
 
 Sullivan
 
 was distinguished:
 

 “Tn
 
 Sullivan
 
 the questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal activities. Petitioners’ claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the ... questions in context might involve the petitioners in the admission of a crucial element of a crime.’ 382 U.S., at 79 ...
 

 “Albertson
 
 was followed by
 
 Marchetti
 
 and
 
 Grosso
 
 where the Court held that the privilege afforded a complete defense to prosecutions for noncompliance with federal gambling tax and registration requirements. It was also followed in
 
 Haynes
 
 where petitioner had been prosecuted for failure to register a firearm as required by federal statute. In each of these cases the Court found that compliance with the statutory disclosure requirements would confront the petitioner with ‘substantial hazards of self-incrimination.’ E.g.,
 
 Marchetti v. United States,
 
 390 U.S., at 61.
 

 “In all of these cases
 
 the disclosures condemned, were only those extracted from a ‘highly selective group inherently suspect of criminal activities
 
 ’ and
 
 the privilege was applied only in ‘an area permeated with criminal statutes’
 
 — not
 
 in ‘an essentially noncriminal and regulatory area of inquiry.’
 
 E.g.,
 
 Albertson v. SACB,
 
 382 U.S., at 79;
 
 Marchetti v. United States,
 
 390 U.S., at 47.
 

 “Although the California Vehicle Code defines some criminal offenses, the statute is essentially regulatory, not criminal. The California Supreme Court noted that § 20002(a)(1) was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities arising from automobile accidents. In
 
 Marchetti
 
 the Court rested on the reality that almost everything connected with gambling is illegal under ‘comprehensive’ state and federal statutory schemes. The Court noted that in almost every conceivable situation compliance with the statutory gambling requirements would have been incriminating. Largely because of these pervasive criminal prohibitions, gamblers were considered by the Court to be ‘a highly selective group inherently suspect of criminal activities.’
 

 “In contrast, § 20002(a)(1), like income tax laws, is directed at all persons — here all persons who drive automobiles in California. This group, numbering as it does in the millions, is so large as to render § 20002(a)(1) a statute ‘directed at the public at large.’
 
 *31
 

 Albertson v. SACB,
 
 382 U.S., at 79, construing
 
 United States v. Sullivan,
 
 274 U.S. 259 (1927). It is difficult to consider this group as either ‘highly selective’ or ‘inherently suspect of criminal activities.’ Driving an automobile, unlike gambling, is a lawful activity. Moreover, it is not a criminal offense under California law to be a driver ‘involved in an accident.’ An accident may be the fault of others; it may occur without any driver having been at fault. No empirical data are suggested in support of the conclusion that there is a relevant correlation between being a driver and criminal prosecution of drivers. So far as any available information instructs us, most accidents occur without creating criminal liability even if one or both of the drivers are guilty of negligence as a matter of tort law.
 

 “The disclosure of inherently illegal activity is inherently risky. Our decisions in
 
 Albertson
 
 and the cases following illustrate that truism. But disclosures with respect to automobile accidents simply do not entail the kind of substantial risk of self-incrimination involved in
 
 Marchetti, Grosso,
 
 and
 
 Haynes.
 
 Furthermore, the statutory purpose is noncriminal and self-reporting is indispensable to its fulfillment.”
 

 402 U.S. at 427-31 (footnotes omitted).
 

 Similarly, here, § 13-51(3) is primarily regulatory, not criminal. Although there are criminal aspects to § 13-51, septic tanks are simply not an area “permeated with criminal statutes,” but the area is essentially a noncriminal, regulatory area. We reject Peak’s contention that the
 
 sole
 
 purpose of § 13-51(3) is to facilitate criminal prosecutions for violations of the servicing requirements in § 13-51(6). Although § 13-51(3) certainly aids the City in determining who is subject to the requirements in § 13-51(6), it also, as noted above, aids the City in gaining additional knowledge regarding the pollution in the lake so that it can continue pursuing ways of protecting the lake by giving the City the exact location of each septic tank in the drainage basin. In addition, although § 13A-51(3) is directed at only those owning property in the drainage basin of Lake Tuscaloosa who have septic tanks on the property, we cannot say this is a group “inherently suspect of criminal activities.”
 

 Most importantly, however, it is clear here that the disclosures required by § 13-51(3) do not pose “substantial hazards of self-incrimination.” The registration form used by the City, which Peak provided to the trial court as an exhibit, asks property owners in the drainage basin to provide their names, mailing addresses, and telephone numbers, and the lot number, site address, and parcel-identification number of the property they own. The form also asks property owners to identify the type of wastewater system on the property; where the system is located on the property; the size of the system; the name of the person or business who installed the system; and the date of installation. None of the information requested is, itself, incriminatory. It is not a crime to own property in the drainage basin of Lake Tuscaloosa, nor is it a crime to have a septic tank on property located within the drainage basin of Lake Tuscaloosa.
 

 All the cases relied on by Peak in his brief striking down statutes as violative of the privilege against self-incrimination involved statutes that required admissions of inherently criminal activity. See, e.g.,
 
 Marchetti v. United States,
 
 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) (statute requiring registration by those engaged in
 
 *32
 
 gambling activities);
 
 Haynes v. United States,
 
 390 U.S. 85, 96, 88 S.Ct. 722, 19 L.Ed.2d 928 (1968) (statute requiring registration of handgun by those who obtained possession of the gun without complying with the statute’s other requirements); and
 
 Albertson v. Subversive Activities Control Bd.,
 
 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965) (statute requiring registration by members of the Communist party). However, “[n]ot all affirmative duties to report violate the privilege against self-incrimination.”
 
 People v. Patterson,
 
 169 Misc.2d 787, 792, 646 N.Y.S.2d 762, 765 (1996), aff'd sub nom.,
 
 People v. Smart,
 
 269 A.D.2d 549, 704 N.Y.S.2d 497 (2000), aff'd, 96 N.Y.2d 793, 750 N.E.2d 45, 726 N.Y.S.2d 343 (N.Y.2001). “The central standard for the privilege’s application has been whether the claimant is confronted by substantial and ‘real,’ and not merely trifling or imaginary, hazards of incrimination.”
 
 Marchetti,
 
 390 U.S. at 53. As the United States Court of Appeals for the First Circuit aptly explained:
 

 “In our complex society, individuals are called upon to provide information to the government on countless occasions and under a great variety of circumstances. Where Congress has framed a disclosure requirement narrowly focused upon criminal conduct, the Supreme Court has on occasion struck down such statutes.
 
 Haynes v. United States,
 
 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968);
 
 Marchetti v. United States,
 
 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968);
 
 Albertson v. Subversive Activities Control Bd.,
 
 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965). But
 
 where the conduct is not inherently criminal, the Court has upheld the statutes even where the reporting could in due course lead the government to uncover criminal conduct. California v. Byers,
 
 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971);
 
 United States v. Sullivan,
 
 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927).”
 

 United States v. Hurley,
 
 63 F.3d 1, 13 (1st Cir.1995) (emphasis added). Here, although there may be a risk, at some point in the future, that the information required by the registration form could lead to the discovery of future criminal conduct on the part of Peak, the registration requirement itself does not require Peak to admit to anything inherently criminal.
 

 Therefore, § 13-51(3) does not violate Peak’s Fifth Amendment privilege against self-incrimination, and Peak is entitled to no relief on this claim.
 

 Based on the foregoing, the judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 WINDOM, KELLUM, BURKE, and JOINER, JJ., concur.
 

 [1]
 

 . Jeffrey Motz, geographic-information-system manager with the City of Tuscaloosa, testified at trial that a drainage basin "is a physical feature of the Earth's surface, a bowl shape that acts as a funnel whereby any water hitting the surface of that would through gravity drain to a lowest point of water source” and that what constitutes a drainage basin is determined by the contours of the surface of the Earth, i.e., the slope of the land. (R. 119.)
 

 [2]
 

 . Section ll-40-10(b), Ala.Code 1975, provides that "[o]rdinances of a city or town enforcing police or sanitary regulations and prescribing fines and penalties for violations thereof shall have force and effect in the limits of the city or town and in the police jurisdiction thereof and on any property or rights-of-way belonging to the city or town.”
 

 [3]
 

 . Section 13-51 of the Tuscaloosa Municipal Code was originally enacted by Ordinance No. 6619, adopted by the Tuscaloosa City Council on August 3, 2004. Over the next two years, § 13-51 was amended five times by ordinances no. 6665, no. 6729, no. 6861, no. 6898, and no. 6943. All six ordinances pertaining to § 13-51 were introduced into evidence by the City at trial.
 

 [4]
 

 . Throughout his brief on appeal, Peak makes such statements as "the registration process necessarily requires the homeowners to dig up their yards and prove to the City that their septic tanks are not polluting the Lake[]” (Peak’s brief, at pp. 10-11); "the City of Tuscaloosa's ordinance is inconsistent with state regulations governing inspection and maintenance of septic tanks” (Peak's brief, at pp. 14-15); the "registration process includes providing the City with a form that includes information gathered by the commercial contractor who inspects the tank who also provides a certification to the City that the tank has been inspected and pumped as part of that process” (Peak’s brief, at p. 29); "[t]he ordinance’s requirement that homeowners pump their septic tanks every three years is inconsistent with the regulations of the State Board of Health” (Peak's brief, at p. 29); ”[t]he City, in passing its own requirement that dictates that
 
 every
 
 homeowner in the 'drainage basin’ have his septic tank pumped
 
 every three years
 
 frustrates the well reasoned, careful determination by the State Board of Health that no such requirement should be imposed on homeowners” (Peak's brief, at pp. 31-32); ”[t]he City’s ordinance, in arbitrarily requiring all homeowners in the drainage basin to dig up their yards for an [sic] visual
 
 *11
 
 inspection by a commercial contractor where there has been no report of a failing septic tank or a request for such inspection by the homeowner or lending institution representing the owner o[r] buyer, is inconsistent with the State Board’s decision that inspections of existing septic tanks should only be required under very limited circumstances” (Peak's brief, at pp. 32-33); "the City has chosen to impose the drastic requirement that all homeowners within the drainage basin of any of the Lakes or their tributaries dig up their yards and prove to the City that their septic tanks are not leaking” (Peak’s brief, at p. 44); "there are ‘less restrictive’ means of detecting the location of failing septic tanks than having all homeowners within the ‘drainage basin’ dig up their yards every three years to prove to the City that their tanks are not leaking” (Peak’s brief, at pp. 48-49); and "the City cannot broadly require everyone within a certain distance from the Lake[ ] to dig up their yards and have their septic tanks visually inspected every three years in order to prove they are not polluting the City’s Lake” (Peak’s brief, atp. 59).
 

 [5]
 

 . We note that Peak appears to argue that this is not the correct standard for determining whether a municipal ordinance conflicts with state law, and that a municipal ordinance may, in fact, be in conflict with state law even if it does not prohibit what state law expressly permits. He cites in his brief numerous cases in which Alabama appellate courts have found a conflict between a municipal ordinance and a state law. However, all of those cases did, contrary to Peak’s argument, follow the general law stated above, and did involve ordinances that prohibited conduct that was expressly allowed by state law. See, e.g.,
 
 City of Mobile v. Garrett-Montgomery, Inc.,
 
 281 Ala. 204, 201 So.2d 42 (1967) (holding that a municipal ordinance creating a municipal board with the authority to examine the qualifications of plumbers, license those plumbers meeting certain qualifications, and, if necessary, revoke licenses of plumbers, was inconsistent with state law that provided its own regulatory scheme for examining the qualifications of plumbers, licensing plumbers, and, if necessary, revoking the licenses of plumbers);
 
 Busch Jewelry Co. v. City of Bessemer,
 
 269 Ala. 180, 184-87, 112 So.2d 344, 347-50 (1959) (holding, in part, that a municipal ordinance prohibiting optometrists from working in "any wholesale or retail establishment" was inconsistent with state law that "expressly allow[ed] a person, firm or corporation to own and operate a store or business establishment wherein eyes are examined or glasses fitted, as long as the store, business, or opto-metric department is in charge of an optometrist licensed by the state”);
 
 Alabama Disposal,
 
 supra (holding that a municipal ordinance prohibiting landfills within the city’s corporate limits and its police jurisdiction conflicted with a State statute to the extent that the city's ordinance purported to regulate a solid-waste landfill outside the city’s corporate limits); and
 
 City of Mobile v. Madison,
 
 40 Ala.App. 713, 715, 122 So.2d 540, 541 (1960) (holding that a municipal ordinance making it unlawful to transport in a motor vehicle more than one case of alcohol without a municipal permit was inconsistent with state law that expressly permits "an adult [to] transport beer or malt beverages upon the streets of the City of Mobile in quantities greater than ‘one case,’ and violate no State law”).
 

 [6]
 

 . Peak also argues that there are less restrictive means for determining whether any septic tanks in the drainage basin are leaking other than requiring property owners to have their septic tanks serviced every three years. However, as noted above, because Peak was not charged with not having his septic tank serviced, but simply with not registering his septic tank, we do not consider this additional argument.
 

 [7]
 

 . Although that report is not included in the record, we note that Peak did not contest in the trial court the existence of that report, nor does he do so on appeal. In the trial court, Peak did appear to contest the scientific methodology used in obtaining the information contained in the report regarding bacteria levels in the lake and the potential sources of that bacteria, and he disputed, as he does on appeal, whether septic tanks are a danger to the lake. However, he did not contest that the report did, in fact, state that septic tanks are one of the sources of contamination.
 

 [8]
 

 . The report states, in relevant part, that ''[s]torm water runoff in urban areas can contain elevated sediment from construction activities, nutrients from fertilized turf and lawns, toxics from paved surfaces, and bacteria from poorly functioning septic systems” (C. 212); that water samples collected during low-flow periods in the hydrological cycle "represent source water originating from shallow ground-water aquifers" and would detect if "bacteria from poorly maintained septic tanks” was "in contact with shallow ground water” while water samples collected during high-flow periods in the hydrological cycle "represent source water from overland runoff” and would detect "[b]acterial contamination originating from livestock or poultry operations or from poorly managed treatment facilities” (C. 214); that "bacteria associated
 
 *27
 
 with storm water runoff during high stream flow periods is linked to high bacteria concentrations observed in Lake Tuscaloosa" but that "bacteria contamination also occurs in the watershed during low flow periods unrelated to storm water events” (C. 218); and that "[bjacteria levels in the watershed can eventually be reduced by adopting a basin-wide process and plan by which agricultural runoff, animal-waste runoff,
 
 sediment runoff
 
 (both
 
 urban
 
 and agricultural) and
 
 other waste-related activities
 
 ” and threats are identified, monitored, and managed ...” (C. 225; emphasis added).
 

 [9]
 

 . Peak does not argue that he was entitled to an evidentiary hearing on his other claims.
 

 [10]
 

 10. All of diese cases are relied on by Peak in his brief.